562 N.W.2d 903 (1997)
1997 SD 57
In the Matter of the Abuse and Neglect of C.W., B.W. and A.W., and Concerning L.W., R.S. and E.S.
Nos. 19588, 19563 and 19589.
Supreme Court of South Dakota.
Considered on Briefs April 7, 1997.
Decided May 14, 1997.
*904 Jane Loveland Doyle of Doyle and Doyle, Rapid City, for appellant mother, L.W.
Mark Barnett, Attorney General, Joan P. Baker, Assistant Attorney General, Pierre, for appellee State of South Dakota.
Nora K. Kelley, Rapid City, for appellee child, C.W.
Thomas E. Graslie, Rapid City, for appellee father, E.S.
PER CURIAM.
[¶ 1] Mother appeals from a trial court's order awarding custody of C.W. to Father. We affirm.

FACTS
[¶ 2] Mother has three children, A.W., born October 28, 1987; B.W., born December 10, 1989; and C.W., born November 20, 1991. C.W. was born three and one-half months prematurely and has physical and mental developmental delays. All three children have different fathers.
[¶ 3] In October 1993 the children were placed in protective custody of the Department of Social Services (DSS) following allegations, later admitted by Mother, that:
1) on October 19, 1993, C.W. and A.W. were outside in T-shirts and shorts and left unattended;
2) on October 24, 1993, C.W. was sitting in the middle of the road and was almost run over;
3) in 1993 [Mother] disciplined B.W. and A.W. with a wooden spoon and a belt; and disciplined C.W. with her hand.
The record also indicated Mother's home did not provide a healthy environment as there was old food on every surface and in every room and trash and dirty diapers lying about. The children were placed in foster care and their fathers contacted. By stipulation of all parties, on November 1, 1993, legal and physical custody of A.W. was granted to A.W.'s father. B.W.'s father, a resident of North Dakota, requested his parental rights be terminated. C.W.'s father, a resident of Texas, indicated he was interested in obtaining custody of C.W. B.W. and C.W. were placed in foster care and returned to Mother in January 1994.
[¶ 4] C.W.'s father had been expressing interest in C.W. since learning of his existence in 1992. The child was conceived in 1991 during the five months that Father dated Mother while he was in the U.S. Air Force. Father received orders to go to Guam but reported Mother did not wish to accompany him there. She was unaware of her pregnancy when he left and he remained unaware of C.W.'s existence until he received notice from the Office of Child Support Enforcement in July 1992 some nine months after C.W.'s birth. Blood tests established the probability that he was C.W.'s father but he wanted DNA testing as absolute proof. He also indicated to Mother that if C.W. was his child, he wished to have full custody of him.
[¶ 5] On March 4, 1994, DSS was again granted protective custody of B.W. and C.W. after Mother was arrested on felony drug charges of possession and distribution of methamphetamines. The children were again placed in foster care. Mother voluntarily committed herself to a psychiatric ward of a local hospital where she was diagnosed with drug-induced psychosis and a thyroid condition. Following release from the hospital, she completed an inpatient alcohol and drug program and counseling sessions. She remained cooperative with DSS. She attended after-care and parenting classes and visited her children. She pled guilty to the criminal charges against her and sentencing was set for August. Her children remained in foster care.
[¶ 6] By August 1994, paternity had been conclusively established for C.W. through *905 DNA testing. Custody continued with DSS, however, after it informed the trial court it believed separation B.W. and C.W. would be harmful to them. A home study of Father's home in Texas was ordered.
[¶ 7] Father of C.W. appeared with his wife at an October 1994 review hearing. At this time, Mother was serving a 180-day term in the Pennington County Jail as part of a suspended imposition of sentence; she was present at the hearing. Visitation with her children was being arranged through DSS. Mother had recently had work-release privileges revoked due to her being fired from her job but continuing to leave the jail as if she were going to work. Father again expressed his desire to have custody of C.W. The results of the home study were positive with the reservation that Father and his wife needed to take parenting classes as C.W. was a special-needs child. A psychologist's evaluation of B.W. and C.W. opined both children were sufficiently strong emotionally to handle the separation. The trial court, over Mother's objections, ordered temporary physical custody of C.W. to Father in Texas, finding such placement to be in C.W.'s best interests and the least restrictive alternative. The trial court stated it would reserve jurisdiction of the case to monitor it. C.W. was placed in Father's custody on October 11, 1994 and DSS continued supervision of the placement through an interstate compact with Texas social services agencies.
[¶ 8] At additional review hearings in November 1994 and January 1995, legal custody of both children was continued with DSS, with physical custody of B.W. in foster care and physical custody of C.W. with Father in Texas. When C.W. first arrived at Father's, though he was then almost three years old, he was not toilet-trained, his speech was unintelligible, and he often fell when running. Reports from the Texas agency consistently showed C.W.'s placement with Father to be appropriate. Father and his wife took parenting classes, enrolled C.W. in speech therapy and in a school for his special needs, and worked with him at home.
[¶ 9] On January 18, 1995, Mother signed a Family Service Agreement with DSS. DSS told Mother that upon her successful completion of the plan, she could have more visits with B.W. and C.W. and there was the possibility of returning physical custody of her children to her. In February 1995, Mother was released from jail and reintegration of B.W. into Mother's home began. No reintegration procedures were initiated for C.W.
[¶ 10] At a March 14, 1995 review hearing, the court ordered custody of C.W. to continue with his Father in Texas. By this time Mother was out of jail, had secured employment, and was still cooperating with DSS. Reintegration was continuing with B.W. However, DSS would not return B.W. to Mother because Grandmother was living in the home; B.W. exhibited behavior problems following visits with Grandmother. B.W.'s treating psychologist reported B.W. had acquired age-inappropriate sexual knowledge alleged to result from a visit with A.W. and that B.W. reported having secrets with her Grandmother. Mother's plan was to move from Grandmother's home by May 1.
[¶ 11] At an April 10, 1995 review hearing, the court continued custody of B.W. with DSS. The court also ordered physical and legal custody of C.W. to Father in Texas. However, the court promised Mother a hearing, after B.W. was established in her home, regarding the issue of visitation and permanent custody of C.W.
[¶ 12] At a May 23, 1995 review hearing, it was determined B.W. would return to Mother's home after the school year. The court expressed this case was "almost like a divorce case" regarding C.W.[1] In June, physical custody of B.W. was returned to mother with legal custody to be returned within one month. At a June 21, 1995 motion hearing, *906 Mother moved for summer visitation with C.W. At this time, the trial court stated it had not meant to grant physical and legal custody of C.W. to Father and to relinquish jurisdiction to Texas, but to grant only temporary physical custody. An amended order correcting the error was signed and filed. Summer visitation was ordered and took place in Mother's home.
[¶ 13] A final dispositional hearing was held January 10, 1996, after which the trial court requested written input from the parties. The State recommended continued custody of C.W. with Father. B.W.'s psychotherapist, who had previously worked with both children, recommended continued custody of C.W. with Father. The CASA volunteer recommended the same. By telephonic hearing February 7, 1996, the trial court determined the least restrictive alternative and best interests of the child required that Father receive legal and physical custody of C.W.

DECISION
[¶ 14] We review a trial court's findings of fact in an abuse and neglect proceeding under a clearly erroneous standard. In re S.A.H., 537 N.W.2d 1, 5 (S.D.1995). In applying this standard, this Court does not determine whether it would have made the same findings the trial court did, but whether on the entire evidence it is left with a definite and firm conviction that a mistake has been committed. Id. A trial court's conclusions of law are reviewed de novo and are set aside on appeal only when the trial court has erred as a matter of law. In re A.L., 442 N.W.2d 233, 236 (S.D.1989). We will uphold the judgment of the trial court if it is right for any reason. Id.
[¶ 15] Mother argues on appeal that DSS failed to make reasonable efforts to return C.W. to her home and that the trial court erred in placing custody of C.W. with his father. These issues will be discussed together.
[¶ 16] The trial court made a finding of fact that by clear and convincing evidence DSS had shown it had made reasonable efforts to reunite these children with their parents. We find no error in this finding of the trial court's as B.W. was reintegrated into Mother's home and C.W. was placed in his Father's custody. The outcome of Mother's first issue is determined by the fact that C.W. is in the custody of his father rather than a foster family. Her argument fails to recognize C.W. has two parents concerned with his welfare.
[¶ 17] As noted by Mother in her brief to this Court, SDCL 26-8A-21 requires that DSS make reasonable efforts to return a child to his parents. However, here, C.W. has been residing in one of his parents' homes since it was determined Father's home was an appropriate placement. When C.W. was placed in Father's physical custody on October 11, 1994, Mother was in jail, there was no extended family willing or able to care for him, and Father was requesting custody. DSS testified its policy is to place children with a biological parent if possible. Further, the trial court's concerns about splitting the half-siblings were satisfied by the psychological evaluation. Physical custody with Father was appropriate at that time.
[¶ 18] Where Mother's parental rights were not terminated at the dispositional hearing, SDCL 26-8A-22 provided a number of options available to the trial court, including granting legal custody of C.W. with his Father. In deciding which of these options is the least restrictive alternative, the question is viewed from the child's perspective. S.A.H., 537 N.W.2d at 6, In re E.D.J., 499 N.W.2d 130, 135 (S.D.1993); In re S.W., 398 N.W.2d 136, 139 (S.D.1986). The trial court found placing custody of C.W. with Father to be the least restrictive alternative available.
[¶ 19] Father had been married for four months and was living in Texas when C.W. arrived to live with him and his wife. His wife reported Father had told her of C.W.'s existence shortly after they met. At the time of the dispositional hearing, Father was a full-time student in construction engineering with a 3.65 average. Father's wife had *907 some college education and worked full time. She planned to return to complete her degree when Father graduated in 1996. Both Father and his wife testified that they loved C.W. and would provide for his future needs. Father's parents lived two blocks from his home and also provided familial support for C.W. Father and his wife testified they were not opposed to visitation of C.W. by Mother. At the time of the hearing, Mother was making weekly telephone calls to C.W. and sending cards, letters, photographs, and occasionally, gifts. Father and his wife read Mother's mail to C.W. and saved it for him. C.W. showed vast developmental gains while in their custody.
[¶ 20] At the final dispositional hearing, C.W. had been in his Father's custody for fifteen months and was four years old.[2] Father was able to provide a stable, loving and nurturing environment for C.W. which provided for his special needs and included extended family nearby. Housekeeping standards were reported above average and wife's maternal instincts strong. C.W. was happy and thriving in Father's home.
[¶ 21] By all reports, Mother has done an exceptional job turning her life around. As of the dispositional hearing, she had twenty-two months sobriety. She admitted she was raised in a home where drug dealing was the family business. Her father has served time in the penitentiary for selling drugs. It was alleged Grandmother may still be involved with selling or using drugs and Mother recognized she could not have Grandmother living in the home. Mother was employed as a waitress and planning to continue her education in the computer information systems field. B.W. was back in the home and reportedly doing well. A.W. has visitation with her Mother and B.W. in their home.
[¶ 22] Notwithstanding the great strides Mother has made to pull herself and her family back together, we do not find the trial court erred in placing custody of C.W. with Father. The prime concern is always the child's best interests. In re J.A.H., 502 N.W.2d 120, 124 (S.D.1993); In re K.C., 414 N.W.2d 616, 620 (S.D.1987). This Court has previously held "[i]t is very important to note that while this court recognizes that the fundamental nature of parental rights to their children mandates at least a reasonable effort to aid them in maintaining their offspring, it must be remembered that the best interest of the child must always prevail." In re A.D., 416 N.W.2d 264, 267 (S.D.1987) (citing In re T.H., 396 N.W.2d 145 (S.D. 1986); In re S.M., 384 N.W.2d 670 (S.D. 1986)). Additional factors that require consideration here are the compelling interests that must exist to separate half-siblings and C.W.'s special needs. Mother asserts she has her children's best interests at heart. However, when balancing all of the factors involved, from the child's point of view, legal and physical custody of C.W. with Father is in the child's best interests.
[¶ 23] Affirmed.
[¶ 24] MILLER, C.J., and SABERS, AMUNDSON and GILBERTSON, JJ., participating.
[¶ 25] KONENKAMP, J., disqualified.
NOTES
[1] This Court has previously addressed at least three other cases in which custody was transferred in an abuse and neglect proceeding from Mother to Father. In re N.K., 414 N.W.2d 5 (S.D.1987); In re G.H., 390 N.W.2d 54 (S.D. 1986); In re M.W., 374 N.W.2d 889 (S.D.1985) (all decided under former SDCL 26-8-35).
[2] At this writing, C.W. has been in Father's custody two and one-half years and is almost five and one-half years old.