Unified Judicial System

 

 
 Formatting provided courtesy of State Bar of South Dakota
and South Dakota Continuing Legal Education, Inc.
222 East Capitol Ave.
Pierre, SD 57501-2596
HTML Code Â© State Bar of South Dakota, 1999
IN THE MATTER OF A.S.,
Alleged Abused/Neglected Child
[2000 SD 94]
South Dakota Supreme Court
Appeal From The Second Judicial Circuit, Minnehaha County, SD
Hon. Gene Paul Kean, Judge
#21349--Affirmed
South Dakota Supreme Court
Mark W. Barnett, Attorney General
Joan P. Baker, Assistant Attorney General, Pierre, SD
Attorneys for Appellee State of South Dakota.
Nichole A. Carper, Minnehaha County Public Defender, Sioux Falls, SD
Attorney for Appellant Mother.
Considered on Briefs Jul 13, 2000; Opinion Filed Jul 19, 2000
PER CURIAM
[Â¶1] Mother appeals the trial court order terminating her parental rights to two and one-half-year-old daughter, A.S. We affirm.

FACTS AND PROCEDURE

[Â¶2] On February 6, 1997, Mother and Father were involved in the commission of a robbery in Sioux Falls. Four-month old son, C.S., was waiting with Mother in their vehicle while the crime was being committed. He was dressed in a soiled t-shirt and diaper, both of which were too small for him. Upon his parents' arrest, he was taken to Children's Inn and subsequently placed in his paternal grandparents' custody in Minnesota.
[Â¶3] In April 1997, Father began serving a twenty-year sentence at the state penitentiary in Sioux Falls for robbery in the first degree. Charges of commission of a felony while armed and habitual offender were dismissed. In July 1997, Mother began serving a four-year sentence in the Springfield women's prison for accessory after the fact; a robbery charge was dismissed. Daughter A.S. was born October 1, 1997 while Mother was in prison. From her birth until April 1998, A.S.'s paternal grandparents cared for her and C.S.
[Â¶4] Mother was released on parole in March 1998 and cared for A.S. from April to August 1998. In June 1998, her parole officer made a referral to the Department of Social Services (DSS) based on conditions she observed in the home. Both children were then living with Mother in a one-bedroom garage that had been converted into an apartment. Four other adults and one child lived with them. The parole officer noted the home was infested with flies and that flies were observed in open food and an open can of baby formula. The home was "absolutely filthy" with windows boarded shut and no ventilation within. The report indicated A.S. had a very flat affect, showing no emotion or reaction to anything and also noted Mother's history of drug and alcohol use. DSS noted that Mother was on a waiting list for housing and wrote to the parole officer indicating its determination, after review of the referral, that no cause for further investigation had been established.
[Â¶5] By August, the paternal grandparents had separated. Grandfather moved to California and Mother allowed C.S. to accompany him. On August 31, 1998, Mother was stopped at 3:30 a.m. driving a stolen vehicle in Sioux Falls. A.S. was in the vehicle with her. Mother claimed she was unaware the vehicle was stolen and gave false identification to the officer. She was brought into custody on the impersonation charge and returned to prison on the parole violation, this time housed in the women's prison in Pierre. A.S. was placed in emergency foster care as no family member was available to care for her. Mother stipulated that A.S. was a neglected child due to her incarceration. Foster placement continued.
[Â¶6] Mother was denied parole in June 1999. She was parole eligible in February 2000 but the record does not indicate whether she was successful in this bid for parole. She is scheduled for release June 18, 2001. Father's first parole date is February 6, 2007.
[Â¶7] A.S. was ten months old when placed in foster care and, at the date of the dispositional hearing, had been in foster care for fourteen months. DSS workers took A.S. from her foster home in the Sioux Falls area to visit her Mother in prison in Pierre seven times. DSS workers noted that Mother played well with A.S. but did not talk much to her. A.S. did not seem to recognize her Mother.
[Â¶8] A dispositional hearing was held October 22, 1999. At that time, A.S. was two years old. The trial court found neither parent presently able to care for the child and that there was little likelihood these deficiencies would be remedied in the near future. The court terminated parental rights of Mother and Father to A.S. Mother appeals, raising four issues that are consolidated into two for purposes of our discussion.

ANALYSIS AND DECISION

[Â¶9] 1. Whether the trial court erred in ruling that ICWA did not apply and further erred in not granting Mother's request for delay of the proceedings.
[Â¶10] Mother claims the trial court erred in concluding the Indian Child Welfare Act (ICWA) did not apply in this case. A.S. is of Native American and Asian descent. ICWA applies to termination proceedings where the Indian child is "any unmarried person who is under age eighteen and is either (a) a member of an Indian Tribe or (b) [ ] eligible for membership in an Indian Tribe and is the biological child of a member of an Indian Tribe." 25 USC Â§1903 (1)(ii) and (4); In re M.C., 504 NW2d 598, 600 (SD 1993).
[Â¶11] The record shows A.S. is not an enrolled member of the tribe. Mother testified she believes she herself may be enrolled because she received funding from the tribe at one time. This is not evidence of enrollment. There was no evidence of enrollment forthcoming from the tribe and no additional evidence of enrollment was produced. The trial court found A.S. was not enrolled or eligible for enrollment and concluded that ICWA did not apply to these proceedings
[Â¶12] Before a trial court applies the higher standard of proof required under ICWA, "some evidence must show that the child is an Indian and that [ ] ICWA applies. [ ] 'ICWA requires an initial determination by the trial court that the children are Indian children.'" In re B.R.B., 381 NW2d 283, 284 (SD 1986)(quoting In re K.A.B.E., 325 NW2d 840, 842 (SD 1982)). In B.R.B., the evidence was unclear whether Mother and child were enrolled tribal members or eligible for enrollment in the Cheyenne River Sioux Tribe. The tribe had declined jurisdiction without indicating eligibility or enrollment status of Mother or child. We held the trial court did not err in not applying ICWA. Id.
[Â¶13] "It is incumbent upon the party asserting applicability of ICWA to prove the child meets the criteria under ICWA." In re J.D.B., 584 NW2d 577, 582 (IowaCtApp 1998); In re A.M., 455 NW2d 572, 573 (Neb 1990). In the present case, Mother failed to come forward with such proof and the evidence supports the trial court's finding that A.S. is not an "Indian child" as defined under 25 USC Â§1903(4). The court did not err in not applying ICWA.
[Â¶14] As a separate issue, Mother claims the trial erred in denying her request for a delay to allow the tribe additional time to become involved. We hold that ICWA does not apply to these proceedings, therefore, there was no requirement the court delay them to give the tribe more time to act. However, the relevant facts involving notice to the tribe are set forth below.
[Â¶15] A.S. was taken into DSS custody August 31, 1998. DSS contacted the Oglala Sioux Tribe on September 15, 1998, September 18, 1998, May 20, 1999 and September 23, 1999 regarding her custody and the tribe's involvement with this case. DSS received no response despite the fact that its letters and notices of hearings were sent certified and signed receipts were returned by the tribe. DSS made telephone contact with the tribe September 17, 1999 and was informed the tribe would make a motion to intervene or accept jurisdiction. At that time, DSS informed the tribe it would recommend termination of parental rights as Mother was not granted parole in June. DSS sent the tribe copies of court documents to date and informed the tribe of the scheduled dispositional hearing.
[Â¶16] DSS made telephone contact again October 20, 1999, two days before the dispositional hearing, and was informed the tribe would not be involved. However, at the hearing, Mother's attorney informed the court that A.S.'s attorney had been in contact with the tribal attorney who indicated he would fax "some sort of paperwork" to the court the day before the hearing to accept jurisdiction or "at the very least" intervene. The trial court noted, at ten minutes into the dispositional hearing, the tribe had done neither and that nothing had been received by the court.
[Â¶17] As noted, ICWA does not apply in this case. Even so, the facts show that the tribe received sufficient notice under the Act, 25 USC Â§1912(a). The trial court did not err in declining to grant a continuance in these proceedings.
[Â¶18] 2. Whether the trial court erred in finding that termination was the least restrictive alternative and in the best interests of A.S.
[Â¶19] Parental rights may be terminated if it is in the best interests of the child and is also the least restrictive alternative available. SDCL 26-8A-26. The best interests of the child are viewed from the child's, not the parents', perspective. In re E.D.J., 499 NW2d 130, 135 (SD 1993). Our standard of review is "whether the trial court's ultimate finding--that clear and convincing evidence indicated termination was the least restrictive alternative commensurate with the child's best interests--was clearly erroneous." In re J.Y., 502 NW2d 860, 862 (SD 1993); In re A.H., 421 NW2d 71 (SD 1988)
[Â¶20] At the time of the dispositional hearing, A.S. was two years old. She had lived with Mother only four months of her life, from age six months to ten months. Every other month, weather and schedule dependent, for a total of seven visits, the DSS worker drove A.S. the four hours to visit with Mother in prison for one and one-half to two hours. DSS testified that there was no discernable bond between the two during these visits and that A.S. reacted to Mother as she would a stranger. Mother was able to engage A.S. in play, but initiated minimal verbal contact with her daughter. The foster mother reported A.S. is cheerful and easy to care for. DSS testified that A.S. had formed a significant attachment with her foster mother, but this family was not available as an adoptive placement.
[Â¶21] "When it comes to something as important as the welfare of young children, promises of the parents to conform to the standard of care for their children which is expected in our society do not carry as much weight as their past actions of not properly caring for the children.'" E.D.J., 499 NW2d at 137 (quoting In re J.M.V.D., 285 NW2d 853, 855 (SD 1979)). Mother had an opportunity to parent A.S. when she was released on parole in March 1998. Within a few short months, she violated the rules of her release, putting her child's welfare in jeopardy and leaving her once again without a parent. The referral to DSS by her parole officer included in the record shows she also put her children at risk in their home environment, although DSS concluded the conditions did not warrant investigation.
[Â¶22] Mother urged the trial court to consider her next parole eligibility date, however, the court chose not to speculate on her chances for parole and looked instead to the June 18, 2001 date when Mother is scheduled for release from prison. DSS testimony indicated that even after Mother's release, A.S. should not be returned to her until, at a minimum, she had secured adequate housing and had a successful transitional visitation period.
[Â¶23] Parents' incarceration limits DSS in its attempts to rehabilitate the family. In re T.H., 396 NW2d 145, 151 (SD 1986). DSS determined Father was not a placement resource for A.S. as he was serving a twenty-year sentence and had been incarcerated since before A.S.'s birth. Mother's transfer to prison in Pierre limited visits with her child and many were postponed and rescheduled due to inclement weather and the DSS worker's schedule. She was encouraged to complete parenting classes while in prison and did so. However, when she was not granted parole in June 1999, DSS concluded it would recommend termination so a permanent home could be located for A.S.
[Â¶24] Mother's own testimony shows her to be a model prisoner (no one from the prison testified on this subject). However, the facts remain that the trial court had to assume that A.S. would be without her Mother until June 2001 and some time thereafter while Mother found housing and continued visitation. The trial court determined that was too long for A.S. to be kept waiting for a permanent home and stability. We have previously noted:


Children are not static objects. They grow and develop, and their proper growth and development require more than day-to-day satisfaction of their physical needs. Their growth and development also require day-to-day satisfaction of their emotional needs, and a primary emotional need is for permanence and stability. ... A child's need for permanence and stability, like his or her other needs, cannot be postponed. It must be provided early.
In re Baby Boy K, 1996 SD 33, Â¶43, 546 NW2d 86, 97 (citation omitted).
[Â¶25] The court did not err in refusing to make A.S. wait another year and eight months after the dispositional hearing until Mother's release from prison and then wait another indefinite period of time in hopes that Mother would become a suitable placement for her daughter. Termination of Mother's parental rights so that A.S. could be placed in a permanent home now was the least restrictive alternative and in the best interests of the child.
[Â¶26] Affirmed.
[Â¶27] MILLER, Chief Justice, and SABERS, AMUNDSON, KONENKAMP and GILBERTSON, Justices, participating.