2005 SD 124

**In the Interests of E.L. and R.L., Minor Children,**

and concerning

**A.L. and M.L., Respondents.**

**No. 23574.**

Supreme Court of South Dakota.

Considered on Briefs Nov. 7, 2005.

Decided Dec. 21, 2005.

Donna L. Bucher of Tinan, Smith & Bucher, Mitchell, for appellant Mother A.L.

Lawrence E. Long, Attorney General, Kirsten E. Jasper, Assistant Attorney General, Department of Social Services, Pierre, for appellee State.

GILBERTSON, Chief Justice.

[¶ 1.] A.L. (Mother) appeals an order terminating her parental rights to her children. We affirm.

## FACTS AND PROCEDURAL HISTORY

[¶ 2.] Mother has two minor children, R.L. (Daughter) born on July 6, 1999 and E.L. (Son) born on June 8, 2003. On February 24, 2004, Mother took Daughter age 4 and Son age 8 months to their daycare provider around 6 a.m. Later on that morning, the daycare provider noticed that Son's back was arched and his eyes were half closed. She felt this was "odd" and that "something seemed wrong." Son was taken by ambulance to the Mitchell hospital and later airlifted to Avera McKennan Hospital's pediatric intensive care unit in Sioux Falls.

[¶ 3.] After evaluation at both hospitals, it was determined that Son suffered major life threatening injuries including; four healing rib fractures, bilateral subdural hemorrhages,[1] and bilateral retinal hemorrhages.[2] The retinal hemorrhages were described by Dr. West as some of the "most significant ones I've ever seen, but I have seen several infants who've died who have had hemorrhages similar to that." The attending neurosurgeon and radiology staff felt there were some older subdural hemorrhages as well as some new hemorrhages, which could indicate that Son had been injured on more than one occasion. These injuries led local officials to suspect that Son had been violently shaken and was the victim of child abuse. Both children were taken into protective custody by the Department of Social Services (DSS) on February 24, 2004.

[¶ 4.] Mother was interviewed on February 25, 2004, by Detective Don Everson of the Mitchell Police department and Detective Philip Toft (Toft) of the Minnehaha County Sheriff department[3] regarding the injuries Son had sustained. During the interview, which was videotaped, Mother described a relatively stressful life to Toft. She had been in Mitchell on her own since July of 2003. Her husband, the father of these children, had only spent a couple of weeks in South Dakota, arriving only a few days before Son was injured. Mother explained that she was working 40–plus hours a week and was basically a single parent caring for two young children. She

---

1. A subdural hemorrhage means bleeding between the dura mater and arachnoid membranes which encase and protect the brain.

2. These were hemorrhages throughout the retina in both eyes, two real large central hemorrhages where the good vision center is and surrounding the optic nerve. The blood was blocking Son's vision and the hemorrhages also extended all the way out to the edges.

3. Detective Toft became involved in this case after Mother agreed to take a polygraph examination that was to be administered by Toft. However, after Mother admitted to shaking her son, Toft determined that the exam would no longer provide any assistance to the investigation.

also told Toft that Daughter had been diagnosed with ADHD and that Son had been recently sick.

[¶ 5.] During the course of the interview Mother admitted to Toft that she had "accidentally" shaken Son due to her frustration over his fussiness. Mother described to Toft that Son had been crying and crying, that she had had little sleep and that Daughter was crying. She described how she had picked Son up by the chest and then "moved him back and forth" a couple of times saying something like "Stop crying! Stop it!" Mother also demonstrated to Toft how she handled Son by using her purse to show how she had picked him up and moved him to and from her body a couple of times. Throughout the course of this interview Mother never used the word "shook," but instead described her actions as "rocked." However, the movements described by Mother and observed on the videotape indicated that Mother shook Son. Mother also admitted that she had become frustrated with Son like this two or three times since January of 2004. Mother went on to say that she was "sorry she got frustrated," that she "did not know" she had hurt her son, that she would "never hurt him," and that she would "never do it again." Son was discharged from the hospital on March 14, 2004, and placed in a foster care home in Sioux Falls in order to be close to his doctors.

[¶ 6.] Mother contacted DSS requesting information on what she needed to do in order to regain custody of her children. Mother signed a Family Service Agreement (FSA) with DSS and caseworker Heidi Geppert (Geppert) listing three objectives; parenting, anger management, and visitation. Geppert testified that Mother satisfactorily addressed all objectives. Specifically, Mother completed parenting classes twice, once on her own, and once with father and attended every visitation offered. Mother began counseling, had a psychological evaluation and did everything DSS asked of her. Additionally, Mother continually asked DSS if there was anything else she could or needed to do to get her children back. She was told DSS would get back to her if there was anything else.

[¶ 7.] Mother filed a motion for an independent expert on April 26, 2004, requesting that she be allowed to consult and use an expert throughout the proceedings. This motion was denied on May 6, 2004, after the trial court concluded that the request was not reasonable and the services were not necessary. An adjudicatory hearing was held on July 23, 2004. The trial court found that Son was shaken and squeezed while in his Mother's care, that Mother admitted to shaking her son and that Father abandoned the children and Mother. The trial court found by clear and convincing evidence that Son and Daughter were abused and neglected within the meaning of SDCL 26–8A–2. An Order of Adjudication was entered on October 15, 2004.

[¶ 8.] A Dispositional Hearing was held on November 29, 2004. The State sought termination of parental rights as to both Mother and Father based on the adjudication and the finding that Son was the victim of significant injuries under SDCL 26–8A–26.1(2). A Dispositional Order terminating parental rights of both parents was entered on February 2, 2005.[4] The trial court found that DSS did not make reasonable efforts to reunite Mother with her children, but found that reasonable efforts were not necessary under SDCL 26–8A–21.1 as Mother had committed acts which constituted aggravated assault pursuant to SDCL 22–18–1.1. The court fur-

4. Father does not appeal this termination.

ther found that it was in the children's best interests and the least restrictive alternative to terminate the parental rights of Mother and Father.

[¶ 9.] Mother appeals raising the following issues:

1.  Whether the trial court erred in concluding that the least restrictive alternative in the best interests of the children was termination of Mother's parental rights.

2.  Whether the trial court abused its discretion by denying Mother's motion for an independent expert.

### STANDARD OF REVIEW

[¶ 10.] Parental rights may be terminated if it is in the best interests of the child and is also the least restrictive alternative available. SDCL 26–8A–26; *Interest of A.S.*, 2000 SD 94, ¶ 19, 614 N.W.2d 383, 386. The "reasonable efforts" and "best interest of the child" and the "least restrictive alternative" balancing process are essentially issues of fact. *In re K.C.*, 414 N.W.2d 616, 620 (S.D.1987). The trial court's findings of fact will not be set aside unless they are clearly erroneous and due regard shall be given to the trial court's opportunity to judge the credibility of witnesses. *In the Interest of D.T.*, 2003 SD 88, ¶ 5, 667 N.W.2d 694, 697 (citing *Matter of D.H.*, 354 N.W.2d 185, 188 (S.D. 1984)). Moreover, this Court must review the best interests of the child from the child's point of view, not the parents. *A.S.*, 2000 SD 94, ¶ 19, 614 N.W.2d at 386.

### ANALYSIS AND DECISION

[¶ 11.] **1. Whether the trial court erred in concluding that the least restrictive alternative in the best interests of the children was termination of Mother's parental rights.**

[¶ 12.] Under the Adoption and Safe Families Act, commonly referred to as "ASFA",

a child protection system [is established] that subordinates parental rights to the paramount concern for the health and safety of the child when making a decision on whether it is in the child's best interests to preserve the family unit. Under ASFA, the child protection system is not required to expend its limited resources attempting to reunify children with abusive parents if certain circumstances exist. Thus, the act allows states to move toward termination of parental rights more efficiently under certain circumstances.

*People ex rel. D.B.*, 2003 SD 113, ¶ 10, 670 N.W.2d 67, 70 (citations omitted).

[¶ 13.] In South Dakota, ASFA is primarily contained in SDCL 26–8A–21, 26–8A–21.1 and 26–8A–21.2. *In the Matter of I.H.*, 2004 SD 7, ¶ 14, 674 N.W.2d 809, 812. SDCL 26–8A–21 requires reasonable efforts by DSS to reunite a child who has been removed from the home. *Id.* However, ASFA provides an exception to the reasonable efforts requirement when the court determines that a parent has subjected a child to "aggravated circumstances" as defined by state law. *Id.* South Dakota's list of "aggravated circumstances" is contained in SDCL 26–8A–21.1, which provides in relevant part:

Nothing in § 26–8A–21 requires reunification of a child with a parent who:

. . .

(2) Committed a crime defined in § 22–18–1.1 against the child or another child of such parent, or committed conduct described by that section that violated the law or ordinance of another jurisdiction having elements similar to the offense described by that section[.]

[¶ 14.] "The reasonable efforts bypass provision found in SDCL 26–8A–21.1 pro-

vides the trial court with discretion to identify the most egregious cases early in the process and dispense with futile efforts toward reunification." *D.B.*, 2003 SD 113, ¶ 15, 670 N.W.2d at 72. This Court has held that in order "[t]o bypass the requirement for reasonable efforts of reunification, 'aggravating circumstances' must be found." *Id.* ¶ 13, 670 N.W.2d at 71. Here, the trial court determined that DSS did not make reasonable efforts to return the children to Mother, but that Mother committed acts of aggravated assault under SDCL 22–18–1.1. Therefore, the trial court found these acts constituted aggravating circumstances and determined reasonable efforts were not necessary under SDCL 26–8A–21.1.

[¶ 15.] The trial court's findings are supported by the record. Son sustained four fractured ribs, bilateral subdural hemorrhage and bilateral retinal hemorrhages. These injuries were described as life threatening and required Son to remain in the hospital for several weeks. After being discharged from the hospital, Son has had numerous follow-up visits with various specialists. At the present time his long-term prognosis is in doubt; his injuries are healing, but he will need several years of follow-up visits.

■ [¶ 16.] Mother argues that the state's reliance on the bypass provision is not supported by the facts. Mother argues that because she has not been convicted of aggravated assault under SDCL 22–18–1.1, but only criminally charged with it, DSS is still obligated to make reasonable efforts at reunification. However, Mother fails to recognize that the bypass provision supplied by SDCL 26–8A–21.1 provides "nothing requires reunification of a child with a parent who *committed* a crime." (emphasis added). It does not say a parent who is *convicted* of a crime. Therefore, under the plain language of the statute, a conviction is not required in order to invoke the bypass provision. *See In the Interest of Anthony V.*, 12 Neb.App. 567, 680 N.W.2d 221, 231 (2004) (stating "[t]here is no requirement that allegations against a parent which also could serve as the basis for criminal charges must be proven only with evidence of 'a certified conviction.' Rather, there must only be clear and convincing evidence that such conduct occurred.") (citing *In re Interest of Storee J.*, No. A–01–638, 2002 WL 975977 (Neb.App. May 14, 2002)).

■ [¶ 17.] Mother argues that the State did not show that she committed aggravated assault as defined by SDCL 22–18–1.1, as she did not intentionally injure Son. Mother claims that any injuries sustained by Son were accidental. SDCL 22–18–1.1 provides in relevant part:

> any person who ... (7) intentionally or recklessly causes serious bodily injury to an infant, less than three years old, by causing any intracranial or intraocular bleeding, or swelling of or damage to the brain, whether caused by blows, shaking, or causing the infant's head to impact with an object or surface; is guilty of aggravated assault.

While Mother may not have intended the injuries to Son, her actions were clearly *reckless*, resulting in serious injures and hospitalization. The trial court found:

> [Son] had been subjected to significant trauma involving a serious threat to his very life. It clearly appeared that [Son] had been shaken badly and also squeezed while in the care of his mother. As revealed by the doctors who thereafter examined [Son], x-rays and CT scans revealed that [Son] had subdural hemorrhaging or hematomas in his head, that he had massive retinal hemorrhages in his eyes, and that he had four posterior rib fractures which were in the process of healing ... [m]edicial testimony indi-

cated that [Son] was fortunate that he did not die from his condition and that it was one of the most severe situations of its type that had been observed by the treating physicians.

Clearly, Mother's actions constitute aggravated assault under SDCL 22–18–1.1.

[¶ 18.] Lastly, in determining that termination of Mother's parental rights was the least restrictive alternative in the children's best interest the trial court applied SDCL 26–8A–26.1. SDCL 26–8A–26.1 provides in relevant part:

In addition to the provisions of § 26–8A–26, the court may find that good cause exists for termination of parental rights of a parent who:

. . .

(2) Committed a crime defined in § 22–18–1.1 against the child or another child of such parent[.]

As explained, the injuries sustained by Son were the direct result of Mother's actions that constitute the crime of aggravated assault contained in SDCL 22–18–1.1(7). The trial court found that Mother "did in fact shake [Son] and, no doubt, also squeezed him in a much more severe manner than she was even aware of." Thus, Mother's actions meet the requirements of SDCL 26–8A–26.1.

[¶ 19.] This is a difficult case. Normally in termination cases we have parents who have failed to comply with their FSA and have other problems including alcohol and drug abuse. That is not the case here. Mother has completed all that was asked of her and sought out more in an attempt to regain custody of her children. Mother genuinely loves her children and claims she would do anything for them. However,

we must be mindful of the fact that the needs of the child must take priority over the wishes of the parent. To man-

datorily impose a less restrictive alternative in each instance as a prerequisite for termination would thwart this underlying principle in cases where immediate termination is the only viable means to insure that the best interest of the child is protected.

*Matter of B.E.*, 287 N.W.2d 91, 95 (S.D. 1979). We cannot overlook the fact that Mother seriously injured Son. Additionally, just because Mother completed the objectives of her FSA does not establish that Mother would no longer be a risk to the safety of the children. Geppert testified that she believed the children would be at risk if they were returned to the custody of their Mother. She felt that "even though it was a split second poor decision that greatly impacted [Son's] life, it would cause reason to believe it could possibly happen again."

[¶ 20.] Although termination of Mother's parental rights was not in her best interest, her rights must give way to accommodate the needs and best interests of her children. *In re T.H.*, 396 N.W.2d 145, 151 (S.D.1986). Termination of Mother's parental rights was the least restrictive alternative in the best interests of the children.

[¶ 21.] **2. Whether the trial court abused its discretion by denying Mother's motion for an independent expert.**

[¶ 22.] Mother asserts that the trial court abused its discretion by denying Mother's motion for an independent expert to assist her in explaining and understanding the injuries sustained by Son. The appointment of an expert is in the discretion of the trial court. *State v. Stuck*, 434 N.W.2d 43, 50 (S.D.1988). The guidelines for determining when court-appointed experts are essential to an adequate defense are: 1) The request must be made in good faith; 2) the request must be reasonable in all respects; 3) the requests must be time-

ly and set forth reasons which seem to make such services needed or necessary to the defendant; and 4) the request must specify that the defendant is financially unable to obtain the required service himself and that such services would otherwise be justifiably obtained if the defendant were financially able. *State v. Jaques,* 428 N.W.2d 260, 264 (S.D.1988) (citing *State v. Sahlie,* 90 S.D. 682, 245 N.W.2d 476, 480 (1976)). However, if the request is frivolous, unreasonable, unnecessary for an adequate defense, or without underlying factual support, the appointment need not be made. *Id.* (citing *State v. Hallman,* 391 N.W.2d 191, 194 (S.D.1986)).

[¶ 23.] Mother maintains that because the State relied heavily on medical expert testimony to explain the injuries sustained by Son, she needed an expert appointed to help her understand the testimony and possible causes of Son's injuries. The trial court disagreed and found that Mother did not meet the requirements that the services were necessary and that the request was reasonable. The trial court is in the best position to judge the nature and necessity of the appointment of an expert. *Hallman,* 391 N.W.2d at 194. Under the facts, the trial court did not abuse its discretion in determining an expert was unnecessary and unreasonable.

[¶ 24.] The State's reliance on the medical doctors did not come about because the State hired them as experts after the fact to testify at trial in the area of child abuse or neglect. Neither did the State hire them to interpret and testify as to the causes of the injuries suffered by Son contained in the medical records. These were the doctors who cared for Son after he arrived by air ambulance in Sioux Falls and during his stay in the hospital. Neither party was present when these doctors examined Son and observed the injuries he had sustained. The medical testimony presented and relied upon in this case included Son's medical records and testimony taken during a joint deposition of Son's treating medical doctors. There is no indication in the record that these doctors were any less available to Mother than to the State. In fact, Mother was present and participated in these depositions. Mother had the same opportunity as the State to question these doctors about the conditions and any alternative conclusions they could set forth to explain the injuries suffered by Son.

[¶ 25.] The state's reliance on these treating physicians "is not sufficient to warrant the appointment of an expert for the defense. The defense must establish an articulable basis for believing that the state's expert will present evidence which could reasonably be contradicted by other experts in the field." *Id.* at 195.

[¶ 26.] Mother failed to articulate any reasonable facts which would support her request for a court-appointed expert. In Mother's motion for an independent expert, dated April 22, 2004, her stated reasons for requesting an expert were "this alleged abuse is based on medical evidence; that there are copious records associated with the minor child's medical condition, which need to be explained to counsel...." "Merely making a generalized request without a factual basis therefore is insufficient to establish the right of a defendant to a court-appointed expert." *Id.* at 194. Additionally, Mother failed to provide an affidavit that alleged any underlying factual basis for such an appointment. It was only during the May 3, 2004, hearing on this motion that Mother, after apparently attempting to educate herself, explained how she had found a body of research that said there may be other causes, specifically, a reaction to childhood vaccinations, which would cause the same kind of symptoms suffered by Son. The

depositions of the treating doctors were taken on July 2, 2004. Mother had the opportunity at that time and in fact did question one of the doctors on this body of research.

[¶ 27.] The trial court did not abuse its discretion in determining Mother had failed to show why an expert was necessary. Mother failed to articulate any reasonable foundation, both during the hearing and now on appeal to this Court, to explain how her expert could contradict the treating doctor's testimony and her own testimony that she shook Son. A reaction to childhood vaccinations could not reasonably cause *all* the injuries suffered by Son, including the four healing rib fractures.

[¶ 28.] Additionally, the trial court was apparently troubled by the high cost of the expert Mother was requesting and found it unreasonable under the facts. It appears Mother's only proposal for an expert would result in fees of $1500 to merely have the expert review the file, without examining the child. If the expert's testimony was required, an additional fee of $4000 plus expenses would be required for one day of testimony. The trial court held that these fees did not "necessarily appear to be reasonable without the exploration of other expert possibilities." Mother never provided other expert options.

[¶ 29.] It is important to note that the trial court, using the factors set forth in *Jaques,* 428 N.W.2d at 264, held that under the information provided by Mother she did not show how the appointment of an expert was necessary or reasonable. Even then, the trial court, in ruling on Mother's motion for an expert and again at the Adjudicatory hearing, said that if Mother felt there was further justification for an expert she should renew her motion for the expert. The trial court informed Mother that if she could provide further information or facts supporting her motion the trial court would consider the information. Mother never provided additional facts or information. Instead, she just renewed her motion.

[¶ 30.] Under the specific facts of this case, there is no showing that the trial court abused its discretion in determining that the appointment of an expert was unnecessary and unreasonable.

[¶ 31.] Affirmed.

[¶ 32.] SABERS, KONENKAMP and ZINTER, Justices, concur.

[¶ 33.] MEIERHENRY, Justice, dissents.

MEIERHENRY, Justice (dissenting).

[¶ 34.] I respectfully dissent and would reverse for a new trial based upon issue two. I believe that the trial court abused its discretion by not granting Mother's request for an expert. Although the majority says that Mother failed to provide an affidavit alleging "any underlying factual basis for such an appointment," Mother did adequately support her request. The trial court pointed out in its memorandum decision that Mother's attorney "had requested authority to hire an expert for the mother; a particular doctor whom she had located in Minnesota who she believed might provide testimony that there were other potential causes for the injuries which [Son] had sustained, apparently including reactions to shots." The trial court also acknowledged that "[t]he fact testimony could be produced that there are other possible causes or explanations for some or all of [Son]'s severe medical condition on February 24, 2004." Nevertheless, the trial court denied the request and found that Mother had not set forth reasons why expert services were "needed or necessary." If the child's injuries could be attributed to causes other than Moth-

er's shaking and proof of such could only come from an expert, then the expert's services were "needed and necessary." *Cf.* Genie Lyons, Comment & Note, Shaken Baby Syndrome: A Questionable Scientific Syndrome and a Dangerous Legal Concept, 2003 Utah L.Rev. 1109 (arguing that scientific evidence commonly used to establish shaken baby syndrome may not indicate that a baby has been abused).

[¶ 35.] Mother's opportunity to participate in depositions of the State's experts and to cross examine them should not supplant her need for her own expert. Whether the State's experts were treating physicians, as the majority points out, rather than hired experts also should not determine Mother's need for her own expert. An expert was necessary to ensure Mother adequate cross examination of the state's witnesses. Without her own expert, she was hindered in refuting their conclusions. The trial court denied Mother's request partly because all of the medical records submitted by the State "uniformly concluded" the child's severe brain injury preceded by rib injuries resulted from "one or more traumatic events." Denying Mother's request for an expert based upon the court's predetermination as to the weight and credibility of the State's witnesses goes against the court's responsibility to ensure a fair trial. There should be some attempt to level the playing field and provide Mother with adequate resources to present her case. It appears here that the trial court concluded that the weight and credibility of the State's expert was so overwhelming that testimony of "other possible causes or explanations ... could hardly change the court's conclusions in this matter." Therefore, the trial court found against the Mother, in part, because "[a]bsolutely no other possible explanation was submitted for the cause of these injuries."

[¶ 36.] Other possible explanations for the injuries would have had to come from Mother's expert. The court denied her the expert, however, and Mother could not afford to hire the expert on her own. Without the expert, she was unable to refute the opinions of the state's witnesses or offer other possible explanations for the injuries. Thus, she was prejudiced in presenting her case. The trial court abused its discretion in denying her request for an expert. Therefore, I would reverse and remand for the trial court to allow Mother to hire an expert and have her case reheard.