#23747-rev & rem-SLZ

**2006 SD 17**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

THE PEOPLE OF THE
STATE OF SOUTH DAKOTA
IN THE INTEREST OF P.K.,
C.K., & K.K.,                                    Appellants and Minor Children,

and concerning

L.K.,                                                Respondent and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
BROWN COUNTY, SOUTH DAKOTA

* * * *

HONORABLE LARRY H. LOVRIEN
Judge

* * * *

KELLY MARNETTE                          Attorney for appellants
Aberdeen, South Dakota                    minor children.

ANN M. HOLZHAUSER
Assistant Attorney General
Department of Social Services            Attorney for appellee
Pierre, South Dakota                          State of South Dakota.

WILLIAM D. GERDES                       Attorney for appellee
Aberdeen, South Dakota                    Father L.K.

* * * *

CONSIDERED ON BRIEFS
ON JANUARY 9, 2006

OPINION FILED **03/01/06**

#23747

ZINTER, Justice

[¶1.]　　　　Three children appeal the trial court's refusal to terminate their father's parental rights.[1]  We reverse and remand.

## Facts and Procedural History

[¶2.]　　　　On February 16, 1993, L.K. (Father) was convicted of engaging in sexual intercourse without consent.[2]  He was sentenced to ten years imprisonment with five years suspended.  After two and one-half years, Father was released on probation.  During the next four years, Father and D.K. (Mother) had three children, P.K., C.K., and K.K.  Following the birth of the children, Father's probation was revoked,[3] and he was re-incarcerated in the Montana State Prison.

[¶3.]　　　　While Father was incarcerated, Mother and the children moved to South Dakota.  Mother began working with the South Dakota Department of Social Services (DSS) in August 2001, when the children were four years, two years, and nine months of age.  In January 2002, Mother took the children to DSS asking that the children be put up for adoption because she did not want them anymore.

---

1.  Although Father did not request custody of the children at trial, he expressed a desire to retain his parental rights.  However, on appeal, Father has not filed a brief supporting the trial court's decision.  The Department of Social Services has joined the children's brief.  Mother voluntarily terminated her parental rights and is not involved in this appeal.

2.  On October 25, 1991, Father, who was then eighteen years old, had sexual intercourse with two girls, who were eleven and twelve years old.

3.  Testimony at the dispositional hearing held on April 25, 2003, indicated that Father's parole was revoked because he failed to attend group counseling and obtain employment.  Furthermore, a psycho-sexual evaluation of Father, which was introduced into evidence as Exhibit 3, indicated that Father violated his parole by dating a woman that had children.

Mother told DSS that she became so frustrated with the children that she was afraid she would throw them against the wall and cause physical harm. Consequently, DSS filed an abuse and neglect petition.

[¶4.] On May 13, 2002, an adjudicatory hearing was held. Father was still incarcerated and unable to attend the hearing, but he appeared through his attorney. Mother and Father admitted the allegations of the petition, and the trial court adjudicated the children abused and neglected. The trial court also gave legal and physical custody of the children to DSS. Subsequently, DSS placed physical custody with the maternal grandparents.

[¶5.] A review hearing was held on August 15, 2002. At the review hearing, the trial court continued custody with DSS, and the children's physical placement remained with the maternal grandparents. Also, DSS notified Mother that they were going to request a termination of parental rights.

[¶6.] A dispositional hearing was scheduled for February 21, 2003. Mother appeared with her attorney and agreed to a termination of parental rights. Father's attorney filed a motion for a continuance based on a lack of correspondence with Father due to his incarceration. The trial court terminated Mother's parental rights and granted Father's motion for a continuance.

[¶7.] A final dispositional hearing for Father began on April 25, 2003. Although Father was still incarcerated, he appeared via video conference. Father testified that he might be released on parole in June 2003. Father, however, admitted that he was unable to care for the children because of his incarceration. He further admitted that, even if released that day, he would be unable to take over

custody of the children. Father finally admitted that the children were in a "good environment" with the maternal grandparents. After observing all of the evidence and testimony, the trial court found that the conditions that led to the removal of the children still existed. The trial court further found that there was little likelihood that those conditions would be remedied. However, the trial court declined to terminate Father's parental rights, finding that DSS had failed to provide reasonable efforts to reunite the children with Father. The trial court then ordered a sixty day continuance to determine if Father would be released from prison, and if so, whether Father would be able to care for the children. The trial court did, however, express concern about the children being held "in limbo" if Father was not released in June. The trial court stated:

> The Court at this time will continue the matter for 60 days to get that additional information. If, in fact, the father will be out and will be able to be worked with by the department, and the conditions which led to the children being removed from the home, part of which is the father's absence, can be remedied, the Court would consider that. If he's not going to be getting out and not going to be getting out for at least a year, well, the Court's got to consider whether or not at that point the conditions can be remedied so the children can be returned to the custody of the parent, *and the Court will have to consider that in light of the need to have these decisions made in a timely way so that the children aren't held in limbo for an extended period of time waiting for some parent to try to get their life back together.*

(Emphasis added.)

[¶8.]     Pursuant to the court's decision, on August 15, 2003, DSS and Father entered into a case plan for potential reunification. Father agreed to contact DSS once a week. He also agreed to complete parenting classes, anger management classes, and the paperwork necessary to start working toward his GED, all of which

-3-

were available at the prison. Although Father failed to contact DSS on a weekly basis and inform it of his progress, the record reflects that Father was attending the sexual offender program, was on course to complete his anger management classes, and was considered "treatment compliant" for chemical dependency. Furthermore, DSS began home studies of the paternal grandparents and a paternal aunt in Montana.

[¶9.] A continued dispositional hearing was held on September 15, 2003. Because Father still had not been released from prison, he again appeared via a video conference. Despite the trial court's concern at the April 2003 hearing regarding the children being left in limbo if Father was not released that summer, and despite Father's failure to contact DSS weekly as required in his case plan, the court once again declined to terminate Father's parental rights. Instead, the trial court ordered DSS to complete the home studies that were in progress to determine if placement with Father's relatives in Montana would be possible. The trial court reasoned that this decision would increase DSS's ability to provide reasonable efforts to reunite the children with Father and would provide an opportunity to determine if Father should be reunited with the children. The trial court also expressed concern that DSS had not provided enough time for Father to work on the requirements of his case plan.

[¶10.] Approximately six months later, in April 2004, Father was released from prison. Thereafter, on May 14, 2004, all parties reached an agreement under which maternal grandmother would take the children to Montana for a sixty day summer visitation with Father and the paternal aunt. In return, Father agreed to

complete a psycho-sexual evaluation, obtain suitable housing, secure employment or disability benefits, attend anger management classes, sign releases of information, obtain therapy if needed, find an appropriate therapist and pediatrician for the children, and assist financially if possible. DSS provided Father with funding for the anger management classes, the psycho-sexual evaluation, visits at a visitation center, and motel and gas expenses for the maternal grandmother to take the children to Montana for the summer visitation.

[¶11.] Father did not, however, have much success in satisfying the prerequisites for reunification. Although Father completed the psycho-sexual evaluation, he never completed the sex offender program. He was also unwilling to attend further sex offender therapy. Father's refusals caused his therapist to opine that he would never recommend full placement of the children with Father. Furthermore, the state of Montana refused to conduct the home study of Father because the results of the evaluation did not recommend ever placing the children with him. The children's attorney was also concerned about the results of the psycho-sexual evaluation and presented the results to the trial court.

[¶12.] Nevertheless, the summer visitation was continued without Father satisfying the remaining requirements for reunification. Although Father completed an intake for anger management, he failed to follow through with the recommendations. Father also had difficulty finding suitable housing. Upon his release from the penitentiary, he moved in with his parents and then into his girlfriend's home. A CASA worker visited that home, and although the worker did not note any dangers, she concluded that it was too small and did not have enough

space for the children. Additionally, Father had a difficult time sustaining suitable employment, and he failed to complete home based services. But most significantly, Father only visited the children nine times during the sixty days they were in Montana for the summer visitation. Father attempted to justify this lack of interest, claiming that the supervisor at the visitation center made him feel like he abused his children and that he was afraid that being around the supervisor would cause him to "lose his cool."

[¶13.] Although Father did not take full advantage of the summer visitation, the children did have visitation with the aunt and her family. The home study of aunt's family revealed that she and her husband had two children. However, they lived in a "fifth wheel trailer" in another relative's yard. Nevertheless, the state of Montana initially approved aunt for placement with the understanding that final placement with aunt would occur only if a more appropriate home was not available. Ultimately, in February 2005, the state of Montana withdrew aunt's foster care application because she had not maintained contact with the children, had not followed through with many of Montana's requirements, and had not obtained adequate housing.

[¶14.] Following a number of further review and dispositional hearings in South Dakota, a final dispositional hearing was held on February 28, 2005. At this point, three years and six months had expired since DSS's first involvement; the children were now seven, five, and four years of age, and Father had not had any contact with the children since they returned to South Dakota in September 2004. Furthermore, Father did not attend the hearing. Instead, his attorney informed the

court that although Father was not requesting custody, he did not wish to give up his parental rights. Father requested that the children be placed with the Montana aunt. The children and DSS, however, requested that the trial court terminate Father's parental rights.

[¶15.] During the dispositional hearing, the trial court acknowledged that Father was not suitable for the children to live with and that Father should never have custody of the children. The trial court also found that aunt had inappropriate housing for placement and had shown no long-term interest in the children.[4] Although the record does not reflect that Father proffered any other options, the trial court again refused to terminate Father's parental rights. The trial court reasoned that if Father's parental rights were terminated there would be no guarantee that the adoptive family (presumably the maternal grandparents) would not leave with the children. Therefore, the trial court ordered a "permanent guardianship" with the maternal grandparents. The trial court reasoned that this disposition would provide the possibility of further contact with Father and his Montana family, which the court stated has its "pluses and minuses, but . . . [is not] all bad." However, the trial court also acknowledged that the children had been

---

4. The trial court stated:

> The father has chosen not to show up and frankly, he's not a suitable person for the children to go live with in any event. The [aunt is] left in a position where the fifth-wheel isn't an appropriate place to pack all those kids in . . . .

with the maternal grandparents "all these years" and that they "ought to be the ones that [the children] stay with."[5]

[¶16.]    The children appeal questioning whether the trial court erred in refusing to terminate Father's parental rights so a more permanent placement could be effectuated.

## Standard of Review

[¶17.]    Before termination of parental rights may be ordered, reasonable efforts to reunite the family are required.  SDCL 26-8A-21.  Furthermore, termination must be in the best interests of the children and the least restrictive alternative available.  *In re* D.M., 2003 SD 49, ¶27, 661 NW2d 768, 775 (citing

---

5.    The trial court stated:

> It appears to the Court that the department's choice early on was termination of parental rights, even before services were offered to the father, and placement with the biological mother's mother.  And that has been the underlying premise of just about everything else that's happened, including the fact that the Court almost had to use dynamite to get the department to provide any services at all to the father and then they drug their feet.  I mean, the department's work here has been dismal, and their strategy has been to wear down the [aunt] and to wear down the father and they have succeeded in doing that. . . . However, if the Court terminates the father's parental rights, there's no guarantee that there wouldn't be some further double cross and those people will be gone and the children off to some place else.  It's kind of hard to know who to trust here.  If the Court grants the mother's parents some sort of permanent placement, some sort of guardianship, that would preclude them, at least for now, from adopting the kids, that would not exclude the father from their life, which, you know, has its pluses and minuses, but would provide contact with the other side of the family, which isn't all bad. . . . [I]t's not appropriate to send the children back to the father's home. . . . [T]he family

(continued . . .)

SDCL 26-8A-26). These three requirements, "[t]he 'reasonable efforts' and 'best interest of the child' and the 'least restrictive alternative' balancing process[,] are essentially issues of fact." *In re* E.L. and R.L., 2005 SD 124, ¶10, 707 NW2d 841, 845 (citing *In re* K.C., 414 NW2d 616, 620 (SD 1987)). "We review the trial court's findings of fact under the clearly erroneous standard; therefore, they will not be set aside unless 'we are left with a definite and firm conviction that a mistake has been made.'" *In re* S.A., 2005 SD 120, ¶11, 708 NW2d 673, 677 (citing People *ex rel.* J.S.B., Jr., 2005 SD 3, ¶12, 691 NW2d 611, 615 (citing *In re* T.H., 396 NW2d 145, 148 (SD 1986))).

## Analysis and Decision

*Reasonable Efforts to Reunite and Likelihood That Conditions Would Be Remedied*

[¶18.] In this case, the trial court found that reasonable efforts to rehabilitate the family were provided, that the conditions that led to the removal of the children still existed, and that there was little likelihood that those conditions would be remedied. Specifically, the court found:

> IX. Reasonable efforts have been made to rehabilitate the family and to reunite the minor children with the Respondent father but such efforts have proved unavailing.
> X. The conditions which led to the removal of the children still exist, in that the Respondent Father is a convicted sexual offender, who is not following the treatment recommendations of the most recent psycho-sexual evaluation.
> XI. There is little likelihood that these conditions will be remedied to allow the children to be returned to the custody of the children's parent.

_____

(. . . continued)

> that the children have been with for all these years ought to be the ones that they stay with, so that will be the Court's order.

[¶19.] The record supports these findings. First, the record reflects that DSS made reasonable efforts to reunite Father with the children. DSS entered into a reunification plan with Father that contemplated a number of services that were needed to obtain necessary parenting skills. Furthermore, DSS paid for Father's psycho-sexual evaluation, the costs of the visitation center, motel and gas expenses for the children's summer visitation, and it obtained funding for Father's anger management classes.

[¶20.] Nevertheless, the record reflects that the offered services did not eliminate the conditions that led to removal of the children because Father failed to follow through with those services. Father refused to follow through with the recommendations of his anger management evaluation, failed to obtain adequate housing and employment, and declined to take advantage of the home based services that were offered. Moreover, Father's therapist was so concerned about the psycho-sexual evaluation results that he opined Father should never have custody of the children. Finally, Father only visited the children nine times during the sixty days they were in Montana. Thus, the conditions that led to the children's removal remained with little likelihood that they would be remedied if the children were returned.

### Best Interests of the Children

[¶21.] Under these circumstances, we are definitely and firmly convinced that the trial court's decision not to terminate Father's parental rights was not in the best interests of these children. In deciding not to terminate Father's parental rights, the trial court reasoned that a permanent guardianship, as opposed to a

termination, would be in the children's best interest because it would provide the children with an opportunity to get to know Father and Father's Montana family. However, "[t]he best interests of the children are viewed from the children's, not the parents', perspective." *In re D.M.*, 2003 SD 49, ¶27, 661 NW2d at 775 (citing *In re E.D.J.*, 499 NW2d 130, 135 (SD 1993)). Furthermore, "[w]hen it comes to something as important as the welfare of young children, promises of the parents to conform to the standard of care for their children which is expected in our society do not carry as much weight as their past actions of not properly caring for the children." *In re A.S.*, 2000 SD 94, ¶21, 614 NW2d 383, 386-87 (citations omitted).

[¶22.] Here, Father's history of lack of interest in the long-term care and custody of the children is well documented in the record. Father had limited contact with the children throughout their lives; he only visited the children nine times during their sixty day summer visitation, and he did not have any contact with the children from the time they left Montana in September 2004 to the final dispositional hearing in February 2005. Furthermore, at the dispositional hearing, Father did not even request custody of the children but merely asked that they be placed with aunt. Finally, Father has declined to file a brief with this Court opposing the children's request for the termination of his rights.

[¶23.] Similarly, aunt, the only paternal family member that expressed any interest in obtaining custody of the children, displayed an insufficient interest in getting to know them. While aunt did have visitation with the children during their

summer visit, the visitation was only held on weekends.[6] Aunt also failed to keep in contact with the children after they returned to South Dakota. It was only after DSS urged aunt to keep in contact with the children and offered her money to travel to South Dakota for a visit that she started to have some contact with the children over the telephone.[7] Additionally, aunt and uncle already had two children, and they all lived in inadequate housing. Consequently, the state of Montana would not approve them for placement. Therefore, considering that neither Father nor aunt were interested in or available for the long-term care or custody of the children, it was not in the children's best interests to leave open some theoretical possibility that the children might get to know that family. The trial court acknowledged as much stating:

> . . . thinking about the best interests of the kids, having the father not a suitable person and [aunt's family] sort of eliminated from the running as far as them showing any real long-term interest here, [maternal grandparents are] the only other suitable relative or plausible relative we have.

### Least Restrictive Alternative

[¶24.] Additionally, termination of Father's parental rights to facilitate a permanent relationship with the children's only real family (the maternal

---

6. Aunt worked during the evenings, leaving the weekends for visitation. However, there were instances where aunt was unable to be present during the visitations. On one occasion, uncle had to rush his son to the emergency room. Rather than taking the children with them, he left them in the car with his eleven year old daughter for over an hour. On another occasion, aunt had to return the children to the maternal grandmother because she had to work that evening and uncle refused to watch them.

7. Aunt claims that her work schedule prevented her from traveling to South Dakota to visit the children.

grandparents) was the least restrictive alternative in this case. In examining this question, we often consider the parents' efforts and cooperation in utilizing the services offered to them. *See Interest of* A.R.P., 519 NW2d 56, 61-62 (SD 1994); *Interest of* S.R., 323 NW2d 885, 887-88 (SD 1982). "When all Social Services attempts and assistance fail for lack of cooperation, no narrower or less restrictive alternative remains." *Matter of* S.W., 398 NW2d 136, 140 (SD 1986) (citation omitted). In this case, Father showed some interest in cooperating with DSS while he was incarcerated, but upon his release, Father failed to fulfill DSS's requirements for reunification and refused to utilize the services offered to him. As a result of Father's unwillingness to cooperate, he was unable to acquire the requisite parenting skills to care for his children. We have stated that "[a] child should not be required to wait for parents to acquire parenting skills that may never develop." *In Interest of* A.D., 416 NW2d 264, 268 (SD 1987) (citation omitted). In light of the efforts made by DSS as well as Father's refusal to cooperate and his lack of interest in the long-term care of the children, termination was the least restrictive alternative.

[¶25.] Ultimately, termination was required under the trial court's own findings. The trial court found that: 1) a permanent placement was necessary, 2) the children "should never go back to the father," and 3) the children "should be permanently placed with a particular relative." But, by refusing to terminate Father's parental rights and opting for a guardianship, the trial court prohibited the commencement of that permanent adoption proceeding. *See In re Adoption of* H.L.C., 2005 SD 110, ¶25 n2, 706 NW2d 90, 94 n2 (stating that "termination of

parental rights must occur before an adoption can take place"). Although the trial court relied on SDCL 26-8A-21.2, which contemplates permanent guardianships, that statute only applies to dispositions when "aggravating circumstances" are present and reunification efforts will not be undertaken. Thus, the trial court erred in relying on SDCL 26-8A-21.2 in ordering the guardianship in this case.

[¶26.] Furthermore, the trial court failed to adequately consider that guardianships, by their very nature, are temporary. *In re T.L.R.*, 2002 SD 54, ¶18, 645 NW2d 246, 251. Therefore, the trial court's disposition would merely subject the children to further years of insecurity and lack of stability at a time when the trial court was seeking a permanent disposition. Thus, the trial court's dispositional order was inconsistent with its own recognition that permanent placement was necessary, and it was not in the best interests of the children. *See Matter of* C.L., 397 NW2d 81, 85 (SD 1986) (stating that "[t]he best interests of the children require that some certitude and stability enter [these children's] lives") (citation omitted).

[¶27.] In sum, the reunification efforts provided by DSS failed due to Father's lack of cooperation and interest. Furthermore, after years of being in the system, the trial court recognized that it was in these young children's best interests to obtain security and stability with a permanent relative placement. However, it was not in their best interests for a disposition that was designed to leave open the possibility of getting to know a "family" that had repeatedly shown little interest in exercising parental responsibilities over the children. Finally, SDCL 26-8A-21.2 was not an applicable disposition statute. We, therefore, have a firm and definite

#23747

conviction that a mistake was made in refusing to terminate Father's parental rights.

[¶28.] Reversed and remanded for further proceedings.

[¶29.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and MEIERHENRY, Justices, concur.