#26132-a-JKK

**2012 S.D. 22**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF L.S.,
ABUSED/NEGLECTED CHILD

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE KATHLEEN K. CALDWELL
Judge

* * * *

MARTY J. JACKLEY
Attorney General

BETHANY ERICKSON
Special Assistant Attorney General
Sioux Falls, South Dakota                          Attorneys for appellee
                                                   State of South Dakota.


NICOLE J. LAUGHLIN
Minnehaha County Public
 Defender's Office
Sioux Falls, South Dakota                          Attorneys for appellant Mother
                                                   C.S.

* * * *

CONSIDERED ON BRIEFS
ON FEBRUARY 9, 2012

OPINION FILED **03/21/12**

#26132

KONENKAMP, Justice

[¶1.]	In this abuse and neglect appeal, the primary question is whether the Indian Child Welfare Act (ICWA) applies to an Indian child not eligible for tribal membership.

## Background

[¶2.]	On March 30, 2010, L.S., age three, went alone to a neighbor's apartment because his mother, C.S., was drunk. The neighbor soon called the police and reported that the mother was acting disorderly. Police officers responding to the call found C.S. extremely intoxicated with barely intelligible speech. Her blood alcohol tested at .34. She was arrested on outstanding warrants. L.S. was removed from her custody.

[¶3.]	C.S. began drinking early in life; she was first admitted for inpatient treatment at age fourteen. Following treatment, she remained sober for nineteen years. But in 2007 she began drinking again after the deaths of her mother, L.S.'s father, and a daughter due to Sudden Infant Death Syndrome.

[¶4.]	C.S. agreed to work with the Department of Social Services (DSS) in an effort to regain custody of L.S. She signed a stipulation in June 2010 that L.S. was an abused or neglected child within the meaning of SDCL 26-8A-2. She also agreed to a case plan addressing her alcohol and parenting problems. But she struggled to make her appointments with DSS and visitation sessions with L.S. When she did attend, she often arrived intoxicated or exhibiting physical signs of alcohol withdrawal. She resisted initial attempts to treat her alcohol problems,

including counseling and treatment. She also turned down assistance in obtaining her GED.

[¶5.]     After missing two start dates, C.S. eventually entered inpatient alcohol treatment in July 2010. She was successfully discharged in August 2010. She refused to transition into a halfway house, but continued to work on her sobriety and attended appropriate aftercare groups for four months. She did not take advantage of any counseling services or parenting programs.

[¶6.]     L.S. was returned to C.S. on November 5, 2010, for a trial reunification. C.S. relapsed, however, after a physical altercation with her adult son. On November 28, 2010, police officers were dispatched to C.S.'s apartment on a disorderly person report. Officers found the front door wide open. C.S. and her live-in boyfriend were passed out in the living room. L.S. was asleep on the couch. When eventually revived, C.S. had a .25 blood-alcohol level and struggled to communicate with the officers. C.S. was arrested on an outstanding warrant and L.S. was taken back into DSS custody.

[¶7.]     C.S.'s drinking continued, with frequent missed visits and appointments. She tested positive for alcohol and marijuana use. She was dropped from aftercare in April 2011. She missed a scheduled start date for another inpatient alcohol treatment program. In early June 2011, she lost her job as a result of her drinking problems.

[¶8.]     DSS workers attempted to address other concerns, but C.S. was not receptive. L.S. had poor nutrition and was obese when he was with her, but his health improved in foster care. L.S. also had respiratory problems. Although C.S.

was told it would be best not to smoke around L.S., she continued to smoke in her apartment and when L.S. was around. DSS was also concerned about C.S.'s two adult children who either lived or spent significant time at her residence. Both had chemical dependency issues. C.S.'s adult daughter was arrested after a plastic bag containing cocaine was found in C.S.'s home. C.S.'s adult son had domestic violence tendencies and had assaulted C.S. Additionally, C.S.'s live-in boyfriend had committed domestic violence against both L.S. and C.S. Her boyfriend also abused alcohol and had kicked C.S. out of the apartment before.

[¶9.]      A dispositional hearing scheduled for June 15, 2011 was delayed because C.S. was in the emergency room for unknown reasons. A DSS worker discovered later that morning that although C.S. had a high blood alcohol level, she had been discharged and did not go to detox. At a hearing on June 28, C.S. requested a delay to recover from the effects of drinking too much. The court refused but told C.S. she could come and go from the courtroom as necessary. C.S. left after the first break and did not return.* She had told her case worker that she was going to go to the emergency room and then to detox. Instead, she went to a friend's house. C.S. again failed to begin treatment on July 11, 2011.

[¶10.]      When the dispositional hearing was held on July 26, C.S. did not attend. Again her attorney requested a continuance so that "hopefully [C.S.] can get to detox[.]" A continuance was denied. Testimony at the hearing established that L.S. displayed negative behaviors attributable to C.S.'s inconsistent visitation. L.S.'s behaviors included physical aggressiveness with other children and excessive

---

*      C.S. was represented by counsel at all proceedings.

anxiety about upcoming visits with C.S.  L.S. had been seeing a therapist since September 2010 and had made considerable progress despite a regression when he was temporarily returned to C.S.'s home in November 2010.  The therapist helped L.S. address his fears of not being able to wake C.S. up and being alone.  They also worked on L.S.'s reluctance to let others take care of him.  Other testimony established that L.S. improved his communication and physical health while in foster care.  The circuit court terminated C.S.'s parental rights in August 2011.

[¶11.]        C.S. is Native American and eligible to be enrolled in the Crow Creek Sioux Tribe.  She indicated that she intended to enroll once she obtained her birth certificate, but she took no further steps while these proceedings were pending.  Because C.S. was not actually enrolled, an ICWA specialist for the Crow Creek Sioux Tribe concluded that L.S. was not eligible for enrollment.  Since L.S. was not enrolled or eligible for enrollment, the court found ICWA inapplicable.  C.S. contends on appeal that the court erred in this decision, and erred in terminating her parental rights as the least restrictive alternative available.

## Analysis and Decision

[¶12.]        "Parental rights may be terminated if it is in the best interests of the child and is also the least restrictive alternative available." *In re E.L. & R.L.*, 2005 S.D. 124, ¶ 10, 707 N.W.2d 841, 845 (citing SDCL 26-8A-26; *In re A.S.*, 2000 S.D. 94, ¶ 19, 614 N.W.2d 383, 386).  "The 'reasonable efforts' and 'best interest of the child' and the 'least restrictive alternative' balancing process are essentially issues of fact." *Id*. (quoting *In re K.C.*, 414 N.W.2d 616, 620 (S.D. 1987)).  The circuit court's findings of fact in a termination of parental rights case are reviewed under the

clearly erroneous standard. *People ex rel. J.I.H.*, 2009 S.D. 52, ¶ 19, 768 N.W.2d 168, 173 (citation omitted). Those findings "will not be set aside unless 'we are left with a definite and firm conviction that a mistake has been made.'" *People ex rel. P.K.*, 2006 S.D. 17, ¶ 17, 711 N.W.2d 248, 254 (citing *In re S.A.*, 2005 S.D. 120, ¶ 11, 708 N.W.2d 673, 677).

### 1. ICWA Application to Nontribal Member

[¶13.] C.S. argues that the court erred in concluding that ICWA did not apply to this proceeding. When C.S. was a child, she was adopted by non-tribal members in another state. If not for this adoption, C.S. believes she would have been a member of the Crow Creek Sioux Tribe. And if she were an enrolled member, then L.S. would be eligible for enrollment within the meaning of ICWA. Based on these circumstances, C.S. asserts that the spirit of ICWA is not being followed because L.S. is a child Congress intended to protect in a way she was not.

[¶14.] These contentions have consequence: ICWA requires heightened standards for termination of parental rights. Yet those standards apply only if the child is an Indian child, as defined by ICWA in 25 U.S.C. § 1903(4):

> "Indian child" means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.

Thus, the term "Indian child" as defined by the ICWA means "something more specific than merely having Native American ancestors." *In re Arianna R.G.*, 657 N.W.2d 363, 368 (Wis. 2003). Although the purpose of ICWA is to "protect the best interests of Indian children," its concomitant purpose is to "promote the stability

and security of Indian tribes and families . . . ." 25 U.S.C. § 1902. As the North Dakota Supreme Court explained, ICWA is not premised upon racial classifications — "[t]he different treatment of Indians and non-Indians under ICWA is based on the political status of the parents and children and the quasi-sovereign nature of the tribe." *In re A.B.*, 663 N.W.2d 625, 636 (N.D. 2003); *see also Rice v. Cayetano*, 528 U.S. 495, 519-20, 120 S. Ct. 1044, 1058, 145 L. Ed. 2d 1007 (2000).

[¶15.] Indeed, at least one court has held that expanding ICWA to include ethnic Indians ineligible for tribal membership violates the Equal Protection Clause of the United States Constitution as an improper racial classification. *In re A.W.*, 741 N.W.2d 793, 812 (Iowa 2007). We need not venture into the constitutionality question, however, because it is clear that for ICWA to apply, L.S. must be an Indian child as defined by ICWA. There is no dispute that L.S. is not a member of an Indian tribe under 25 U.S.C. § 1903(4)(a). Accordingly, in order to be an "Indian child" under 25 U.S.C. § 1903(4)(b), L.S. must be "*eligible* for membership in an Indian tribe and [] the biological child of a member of an Indian tribe." (Emphasis added.)

[¶16.] Many tribes require persons to register or enroll to be considered members of the tribe; other tribes automatically include as members persons descended from tribal members listed on the tribal rolls as of a certain date. *See United States v. Broncheau*, 597 F.2d 1260, 1263 (9th Cir. 1979) (the common evidentiary standard for establishing Indian status is enrollment, "but it is not the only means nor is it necessarily determinative."). Therefore, the absence of enrollment alone may not necessarily be determinative of whether a person is a

member of a tribe. *See In re Jeffrey A.*, 127 Cal. Rptr. 2d 314, 317 (Cal. Ct. App. 2002); *In re Hunter*, 888 P.2d 124, 125 (Or. Ct. App. 1995).

[¶17.]    In the circumstances here, however, the Crow Creek Sioux Tribe requires an application for membership. *See* Constitution and By-Laws of the Crow Creek Sioux Tribe of Fort Thompson, South Dakota, Art. II, Membership. An Indian tribe's determination of its membership and eligibility for membership is binding and conclusive in an ICWA proceeding. *In re Adoption of C.D.*, 751 N.W.2d 236, 241-42 (N.D. 2008). C.S. has not taken the necessary steps to enroll in the Crow Creek Sioux Tribe, even though she had sixteen months to do so from the time L.S. was removed. Therefore, L.S. is not a biological child of a member of an Indian tribe.

[¶18.]    "[I]n determining whether ICWA applies, state courts 'may not second-guess the internal decision-making processes of the tribe in regard to its membership determination.'" *Id.* at 242 (quoting *In re Phillip A.C.*, 149 P.3d 51, 56 (Nev. 2006)). In July 2011, a representative of the Crow Creek Sioux Tribe confirmed with DSS that C.S. was not a member and, consequently, L.S. was not eligible for enrollment. And the Tribe chose not to intervene. In the face of a tribal decision on eligibility, we have no power to declare L.S. eligible for membership. Tribal determinations on eligibility are conclusive. Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,586, Guideline B.1(b)(i) (Nov. 26, 1979); *see also In re A.L., et al.*, 442 N.W.2d 233, 235 (S.D. 1989) (although child was biological child of Caucasian parents, in deference to tribal determination, ICWA applied).

[¶19.]     As the proponent, C.S. had the burden of proving that ICWA applied. *In re A.S.*, 2000 S.D. 94, ¶ 13, 614 N.W.2d at 385.  She has failed to show that L.S. is an Indian child within the meaning of ICWA.  The circuit court did not err in finding ICWA inapplicable.

### 2. Least Restrictive Alternative

[¶20.]     C.S. contends that the circuit court erred in finding that termination of her parental rights was the least restrictive alternative available.  She asserts that L.S. could have been "placed in another planned permanent living arrangement until C.S. was capable of parenting him again."

[¶21.]     Parental rights may be terminated if it is in the best interests of the child and is also the least restrictive alternative available.  SDCL 26-8A-26.  While termination of parental rights must be exercised cautiously, the "best interests of the [child] must always prevail." *People ex rel. T.G.*, 1998 S.D. 54, ¶ 16, 578 N.W.2d 921, 923 (citation omitted).  A child's best interests are viewed from the child's perspective. *In re A.S.*, 2000 S.D. 94, ¶ 19, 614 N.W.2d at 386.

[¶22.]     C.S. had sixteen months to take advantage of many opportunities to address her problems.  She completed some treatment, but failed overall to improve to the point where she could care for L.S.  C.S. has not provided any reason why more time would allow her to be successful in treating her alcoholism.  Further, more time in a temporary placement would not be in the best interests of L.S.  "A child should not be required to wait for parents to acquire parenting skills that may never develop." *Matter of J.Y.*, 502 N.W.2d 860, 862 (S.D. 1993); *see also People ex*

*rel. L.S. et al.*, 2006 S.D. 76, ¶ 39, 721 N.W.2d 83, 94. Testimony established that L.S. thrived when he was placed in a structured, safe, and healthy environment.

[¶23.]     C.S. also argues that the circuit court failed to take into account her good faith efforts to cooperate with DSS, as required by SDCL 26-8A-21. She asserts that she did go to treatment and achieved sobriety for a time. She also points to the areas of parenting where she did not struggle, such as providing a suitable home.

[¶24.]     The circuit court considered all the efforts C.S. made. But these good faith, temporary efforts cannot negate the fact that despite having sixteen months to do so, C.S. was unsuccessful in providing a suitable, sober home for L.S. She did not take advantage of any parenting classes or counseling to address her problems other than alcoholism. She took no steps to ensure that L.S. would be returning to a home without domestic violence and substance abuse. C.S.'s apparent inability to be actively involved in the court proceedings, due to intoxication or its effects, only reinforces the circuit court's conclusions. The court considered the entire record of C.S.'s behavior and efforts, as well as L.S.'s progressive improvement, and found that it was in his best interest that C.S.'s rights be terminated. The court also found that this was the least restrictive alternative available. "When it comes to something as important as the welfare of young children, promises of the parents to conform to the standard of care for their children which is expected in our society do not carry as much weight as their past actions of not properly caring for the children." *People ex rel. L.S.*, 2006 S.D. 76, ¶ 39, 721 N.W.2d at 94-95 (citations omitted).

#26132

[¶25.]     Affirmed.

[¶26.]     GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and WILBUR, Justices, concur.