#28040, #28221-aff in pt, rev in pt, & rem-SRJ
**2018 S.D. 48**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

In the Matter of M.C.,
Alleged Abused/Neglected
Child

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JOSEPH NEILES
Retired Judge

\* \* \* \*

MARTY J. JACKLEY
Attorney General

JOSEPH N. THRONSON
Special Assistant Attorney General
Department of Social Services
Pierre, South Dakota

Attorneys for petitioner and
appellee State of South Dakota.

MARK KADI
Minnehaha County Public Advocate
Sioux Falls, South Dakota

Attorneys for respondent and
appellant K.C.

\* \* \* \*

CONSIDERED ON BRIEFS
ON FEBRUARY 12, 2018

OPINION FILED **06/20/2018**

#28040, #28221

JENSEN, Justice

[¶1.] K.C. (father) appeals a dispositional order in a child abuse and neglect proceeding that awarded M.J. (mother) custody of M.C. (child), currently thirteen years old, with supervised visitation rights for father. We summarily affirm in part, reverse in part, and remand.

**Facts and Procedural History**

[¶2.] Mother is thirty-six years old. Mother resided in Sioux Falls during most of the proceedings, but she resided on the reservation and temporarily stayed in other locations during the case.[1] At the time of disposition, mother had five children. This case, however, concerns only child, as the other children had different fathers. Father is a forty-seven-year-old resident of Sioux Falls. He is not Native American. The record is not clear on when his relationship with mother began or ended. However, in 2010, father began living with a girlfriend who had her own two children. Father and his girlfriend eventually married.

[¶3.] Child was born in 2004, and his residence shifted back and forth between mother's and father's homes. This changed in 2007 when mother's brother physically abused child and mother and father stopped cooperating on custody matters. Father brought a paternity/custody action against mother and was awarded custody with visitation rights granted to mother. Mother exercised her

---

1. Mother is affiliated with the Oglala Sioux Tribe, and child is eligible for enrollment in that Tribe. Early in the case, the Tribe filed a motion to transfer jurisdiction, but father objected and the Tribe withdrew the motion. The Tribe intervened in the case but failed to appear at any of the proceedings. The circuit court concluded that the Indian Child Welfare Act (ICWA) applied. No issues are raised over non-compliance with ICWA or its notice requirements.

visitation rights infrequently as time went on. The relationship between father and mother worsened during this time.

[¶4.] In the fall of 2011, mother requested an overnight visit with child because child's grandmother was coming for a visit. Father allowed the overnight visit and told mother that child had gotten into trouble for an incident at school and that he had "whooped child's ass" for his misbehavior. Based upon prior incidents, mother suspected child would be bruised and looked child over, finding bruises down his back to his posterior. Although mother feared losing visitation with child, she took him to school the next morning and talked to child's teacher about the incident at school and child's bruises. The teacher notified her superiors, and after examining child's bruises, the school officials reported the matter to law enforcement and the South Dakota Department of Social Services (DSS).

[¶5.] The authorities observed marks on child's body, including marks across his legs and a bruise on his back. Child told them that father "whooped him" for his misbehavior at school and imposed other discipline including making child hold books out away from his body while keeping his arms straight. Child was crying and upset during the conversation. He worried that if father found out he had talked about the incident he would get "whooped" again.

[¶6.] Child was taken into temporary custody and transported to a local child protection/advocacy center for a forensic interview and medical examination. Child repeated his remarks about being "whooped" by father and further mentioned being hit with a belt and father's fist. The medical examination revealed injuries to

child's upper thighs, back, and buttocks. One of the bruises appeared to be a "pattern bruise" caused by a belt buckle.

[¶7.]     Based upon an investigation, including interviews with father, the State filed an emergency petition on October 20, 2011, alleging abuse and neglect of child. A more detailed petition was filed on November 8. Child remained in DSS custody.

[¶8.]     The adjudicatory hearing began on February 15, 2012, and continued on March 13. Following the adjudicatory hearing, the circuit court issued a memorandum decision finding child abused and neglected as to both father and mother. The court stated that there was "no doubt in [its] mind that . . . child was physically abused" by father. As for mother, the court determined child was "without proper care . . . through no fault of [mother]." *See* SDCL 26-8A-2(5). The adjudicatory findings of fact and conclusions of law and an adjudicatory order were filed on May 7, 2012.

[¶9.]     After adjudication, DSS attempted to work with both parents to reunify child with one of them. However, DSS focused on reunification only with mother because of the physical abuse by father and his lack of cooperation in the case. Periodic review hearings were held, but the final dispositional hearing was delayed for a series of reasons, most of which involved continuing attempts at reunification and maintaining stability for child while in mother's home.

[¶10.]    The dispositional hearing was eventually set for May 2014, but mother became pregnant by her boyfriend, and the hearing was delayed because of the

birth of mother's fifth child. Testimony as to disposition was then taken during a series of days from August 2014 until February 19, 2015.

[¶11.]    The evidence at the dispositional hearing showed that child was placed in foster care from October 2011 until a trial reunification was attempted with mother in March 2012. All the children were removed from mother's home in September 2012 after one of mother's other children (A.J.) reported that she had been sexually abused by mother's boyfriend for a lengthy period of time. No other children reported being abused. At least one child reported observing the sexual abuse of A.J. and reported that mother told him not to say anything. After the report of sexual abuse was made, mother admitted that A.J. previously told her of the sexual abuse by mother's boyfriend, but mother failed to report it because she did not believe A.J. Mother believed that A.J.'s report was motivated by her desire to live with her father. A separate abuse and neglect proceeding involving the other children was filed against mother at this time.[2]

[¶12.]    Child remained in foster care from September 2012 until November 2013. Initially, supervised visits with mother were inconsistent because of transportation, communication, health, and other issues for mother. DSS began unsupervised visits between mother and child in the summer of 2013. However, the unsupervised visits apparently ended after DSS learned that mother allowed boyfriend to stay with her during one or more of these unsupervised visits, contrary

---

2.    A.J. recanted these allegations and the charges were dropped against the boyfriend, but concerns persisted as to whether the sexual abuse had occurred. At the dispositional hearing, the circuit court did not make a definitive finding whether A.J. had been sexually abused by the boyfriend, but it found that there was no evidence child was involved.

to DSS direction. In September 2013, mother left Sioux Falls to live with her father in Martin, South Dakota, in an attempt to reunify with her other children as the abuse and neglect proceedings involving the other children had been transferred to tribal court. Mother missed several scheduled visits with child during this time, which was very upsetting to child. The other children were returned to mother in October 2013 while she was still living on the reservation.

[¶13.] In November 2013, child was reunited with mother on the reservation. Mother stated at this time that she was not planning to return to Sioux Falls. Nevertheless, mother returned to Sioux Falls shortly thereafter with the children. She informed DSS that she could not stay with her father in Martin because her family was drinking heavily around the children. In early December, mother had an altercation with her boyfriend over custody of one of the other children. Because of safety concerns arising from this incident, Mother and DSS began discussing options for her and child. The next day mother asked DSS to take physical custody of child so she could leave for North Dakota. Mother and the other children instead decided to stay temporarily at Children's Inn in Sioux Falls while child was placed back into foster care. Child was very upset about being placed back into foster care. A few days later, child reunited with mother at Children's Inn. In March 2014, mother was incarcerated for seven days after she was arrested for shoplifting.[3] DSS made arrangements for child to stay at Children's Inn while mother was incarcerated.

---

3. Mother informed DSS that the children had stolen several items and that she had taken responsibility for the theft.

[¶14.] After mother gave birth to her fifth child in May 2014, the baby tested positive for marijuana. Mother also tested positive for marijuana, but subsequent UAs were negative. Shortly thereafter, mother left for Rapid City without informing DSS. She was later found to be with her boyfriend in Rapid City. Mother told DSS that she left child at her father's home in Martin. DSS was initially unable to confirm this information. DSS was eventually able to confirm the whereabouts of child after mother returned to Martin. Mother and the children continued to travel back and forth to Martin and Rapid City to visit boyfriend over the summer.

[¶15.] In September 2014, child's school reported a mark on child's back. Child initially denied that mother hit him but later claimed that she used a cord to hit him on his back. Mother claimed that she had only used her hand to hit child on the back. Although DSS eventually determined the abuse claim to be unsubstantiated, child was placed back in foster care because of the report and because of child's behavioral issues at home and school. DSS provided additional counseling and also arranged for a parent aide to assist mother in managing child's behaviors. Child was returned to mother's care in December of 2014.

[¶16.] The evidence showed that child had significant issues at home and school during the times he was in mother's physical custody. DSS provided services to mother for more than three and a half years while the abuse and neglect proceedings were pending. These services included financial assistance, transportation, foster care, and other temporary care arrangements when mother was unable to provide care, child and family counseling, and other in-home services.

Child was bonded with both father and mother but had a closer bond with mother. Child was comfortable visiting father but expressed a desire to live with mother.

[¶17.]    The circuit court issued a memorandum decision as to final disposition in June 2015. The court granted mother custody of child and granted father supervised visitation rights. The decision further stated that, after DSS "[dropped] out of the picture," the only way the court would become involved again was if either parent moved for a change of custody based upon a change of circumstances.

[¶18.]    The court encouraged the parents to work out a visitation schedule for father, but the parties were unable to do so. The parties failed to present proposed findings of fact, conclusions of law, and a dispositional order until February 2016. Consistent with the memorandum decision, the final dispositional order, entered on March 22, 2016, awarded mother custody of child with supervised visitation for father. The order also dismissed the court's "jurisdiction of [the] case" over "further proceedings in [the] abuse and neglect action" and directed DSS to close its case.

[¶19.]    Prior to the entry of the final dispositional order, father filed a motion to change custody. The motion asserted additional, more recent allegations of sexual abuse of A.J. by mother's boyfriend in mother's home. The motion also alleged the existence of video evidence of the abuse, that mother and boyfriend had fled to the reservation to avoid charges against father, and other chaos in mother's home. Law enforcement affidavits, which were made a part of the record before the circuit court entered its final dispositional order, detailed the contents of the video showing boyfriend's sexual assault of A.J. in mother's home. The motion was not set for hearing and the circuit court did not address this motion in its final

dispositional order.[4] Father filed a second motion to change custody after the entry of the dispositional order, alleging the same facts as the first motion. A hearing was held on the motion on October 11, 2016. The circuit court issued its memorandum decision denying father's motion to change custody in January 2017, and entered findings of fact, conclusions of law and an order confirming the decision on March 20, 2017.[5] Father timely appealed both the final dispositional order and the order denying father's motion for change of custody. Both appeals were consolidated by order of this Court.

[¶20.]    Father claims the circuit court erred in adjudicating father on the abuse and neglect petition. He also raises several issues concerning the circuit court's decision to place custody of child with mother and the denial of father's motion to change custody. We summarily affirm as to all issues raised by father, except for one issue that we discuss below.

---

4.    The circuit court was made aware that DSS had taken legal and physical custody of child and that new abuse and neglect proceedings had been instituted against mother in tribal court. The record does not show the outcome of these proceedings, but by the time of the hearing on father's motion for change of custody in October 2016, mother again had physical custody of child.

5.    In denying father's motion to change custody, the circuit court noted mother had been charged in federal court with being an accessory to the alleged sex abuse. The record shows that this charge was reduced to a misdemeanor charge of harboring a felon and that mother had been placed on three years of supervised probation. The circuit court found that there was no evidence child had been sexually abused by boyfriend. The court further determined that father was not a placement option because of his severe physical abuse of the child and that if the child was not placed with mother, it was "highly likely" the parental rights of both parents would have been terminated. The circuit court further stated, "if [mother] has acted in such a way that the [DSS] would seek to terminate the placement of [child] with her, the only option left for this court would be to terminate both parents' parental rights."

## Analysis

### Whether the circuit court abused its discretion in placing child in mother's custody and dismissing the case.

[¶21.]     Disposition of children adjudicated to be abused and neglected is reviewed for abuse of discretion. *People ex rel. C.G.*, 2003 S.D. 78, ¶ 12, 667 N.W.2d 279, 282; *In re N.K.*, 414 N.W.2d 5, 7 (S.D. 1987). "[A]buse of discretion 'is a fundamental error of judgment, a choice outside the range of permissible choices[.]'" *People ex rel. A.O.*, 2017 S.D. 30, ¶ 8, 896 N.W.2d 652, 654 (quoting *MacKaben v. MacKaben*, 2015 S.D. 86, ¶ 9, 871 N.W.2d 617, 622).

[¶22.]     Disposition must be "in the best interests of the child and . . . the least restrictive alternative available." *People ex rel. S.H.E.*, 2012 S.D. 88, ¶ 29, 824 N.W.2d 420, 428 (quoting *In re L.S.*, 2012 S.D. 22, ¶ 12, 812 N.W.2d 505, 508). Best interests and the least restrictive alternative are "viewed from the child's . . . perspective." *Id.* (quoting *People ex rel. P.S.E.*, 2012 S.D. 49, ¶ 33, 816 N.W.2d 110, 119); *C.G.*, 2003 S.D. 78, ¶ 14, 667 N.W.2d at 282. They are "essentially issues of fact" subject to review for clear error. *People ex rel. P.K.*, 2006 S.D. 17, ¶ 17, 711 N.W.2d 248, 254 (quoting *In re E.L. and R.L.*, 2005 S.D. 124, ¶ 10, 707 N.W.2d 841, 845); *accord S.H.E.*, 2012 S.D. 88, ¶ 18, 824 N.W.2d at 425. This Court does not set aside findings as to those issues "unless 'we are left with a definite and firm conviction that a mistake has been made.'" *P.K.*, 2006 S.D. 17, ¶ 17, 711 N.W.2d at 254 (quoting *In re S.A.*, 2005 S.D. 120, ¶ 11, 708 N.W.2d 673, 677); *accord S.H.E.*, 2012 S.D. 88, ¶ 18, 824 N.W.2d at 425.

[¶23.]     The State did not request termination of parental rights and the parties did not advocate for any permanent placement option other than physical

custody with one of the parents. DSS and child's attorney supported placement with mother, while father objected to mother receiving custody, expressed concerns with the welfare of child in mother's care, and argued he should receive custody. Further, no one claims on appeal that the circuit court erred by failing to terminate the rights of either parent. Rather, father claims that because of chaos and instability in mother's home, the circuit court erred by placing custody of child with mother and ordering DSS to close its file.

[¶24.] The circuit court made detailed and extensive findings about father's physical abuse of child. The court also found that father refused to take responsibility for his actions, refused to participate in recommended counseling and programming, and had an "oppositional" attitude toward DSS. The court was also concerned with father's current wife and her influence in the home. For these reasons, the circuit court determined that it "would be difficult if not impossible for [it] . . . to consider placing [child] with his father as a primary custodian." The circuit court's findings are supported by the evidence.

[¶25.] The circuit court also made detailed findings concerning mother's situation. The circuit court's findings raise concerns about mother's parenting capacity, including her failure to make good decisions for the safety and protection of her children, the allegations of abuse by her boyfriend, and the continued instability in her household up through the time of the final dispositional hearing. Even while the dispositional hearing was pending, mother expressed reluctance to DSS to have child in her home, and wanted DSS to keep child and "let the court decide what to do with him." The circuit court found that DSS told mother that it

"wanted to dismiss the case with placement with her, but they needed to have [child] in the home for a period of time first to monitor how things were going." The circuit court also found that DSS was still providing "active efforts" and significant services to mother even during the final dispositional hearing and that "she does not always make good decisions when it comes to making her children a priority in her life." The court viewed mother's cooperation with DSS as making the difference in the case and found that mother had shown improvement in some areas during the time that DSS was providing services to her. The court also noted evidence of bonding between child and mother's other children while there was little evidence of bonding with the child of father and his wife.[6]

[¶26.]    In placing child with mother, the circuit court recognized the array of statutory protections available as a part of the final dispositional order under SDCL 26-7A-107 and SDCL 26-8A-22. However, after deciding permanent placement and addressing its concerns with both parents, the circuit court gave no consideration to whether protective supervision under SDCL 26-8A-22 or a protective order under SDCL 26-7A-107 was in the best interests of the child. "Where . . . parental rights [are] not terminated at the dispositional hearing, SDCL 26-8A-22 provide[s] a number of options available to the trial court[.]" *In re C.W.*, 1997 S.D. 57, ¶ 18, 562 N.W.2d 903, 906. Those options under SDCL 26-8A-22(1) include placing "the child in the custody of one . . . of the child's parents . . . with or without protective

---

6.    Although this was not a change-of-custody dispute arising out of a divorce, the court also identified and discussed the factors from *Fuerstenberg v. Fuerstenberg*, 1999 S.D. 35, 591 N.W.2d 798, in deciding to place custody of child with mother.

supervision[.]" "Protective supervision" is defined in SDCL 26-7A-1(23) as "a legal status created by court order under which an alleged or adjudicated abused or neglected child is permitted to remain in the home of the child's parents, guardian, or custodian or is placed with a relative or other suitable person and supervision and assistance is provided by the court, Department of Social Services, or another agency designated by the court[.]" Further, SDCL 26-7A-107 sets forth a number of orders of protection the court may consider as a part of an abuse and neglect final disposition.

[¶27.]    While we cannot say the circuit court abused its discretion in determining that custody of child should be placed with mother rather than father, it was incumbent on the circuit court, on this record, to consider whether placement with mother should include any of the statutory protections. Father's objections to placement of child with mother raised legitimate concerns with mother's ability to protect and provide for child's ongoing welfare. For over three and a half years, DSS worked to reunify child with mother, provided lengthy periods of physical care for child, and provided significant services and protection when child was in mother's custody. During this time, child spent more than 24 months in foster care and was removed four times from mother's care either at mother's request or because of concerns for child's welfare. The circuit court found that mother had made progress and that her willingness to work with DSS made all the difference in the case, but the court made no determination whether mother could provide for child's welfare without the benefit of DSS involvement.

[¶28.]    "[T]he children's best interests remain the highest priority" in an abuse and neglect proceeding. *People ex rel. L.S.*, 2006 S.D. 76, ¶ 38, 721 N.W.2d 83, 94.  Under the unique circumstances of this case, and viewing the best interests of child from the perspective of child, the circuit court should have considered whether the statutory protections afforded by SDCL 26-8A-22 and SDCL 26-7A-107 were in child's best interests and a part of the least restrictive alternative.  In *In re J.A.H.*, 502 N.W.2d 120, 125 (S.D. 1993) this Court affirmed a circuit court's final dispositional order denying the State's request for termination of parental rights and ordering DSS to provide protective supervision "until [Child] reaches the age of majority or until further order of this [trial] Court."  In affirming the circuit court's order, this Court stated:

> We are not persuaded that DSS is left with a "near impossible task" of regularly monitoring Child.  DSS routinely engages in such monitoring.  The mere fact that long-term supervision may be necessary is not sufficient to overcome the requirement that *it is the child's best interest*, not the convenience of the State, which is the paramount interest.

*Id.*

[¶29.]    We remand that part of the dispositional order awarding mother custody of child with instructions for the circuit court to consider whether it should be modified to include provisions for protective supervision of child by DSS under SDCL 26-8A-22 and/or for a protection order under SDCL 26-7A-107.  Any such provisions found in child's best interests shall specify their parameters and duration.  If on remand child is found to be in the legal or physical custody of DSS, or other DSS protective supervision, as part of another abuse and neglect proceeding, the circuit court may deny further proceedings in this case and shall

-13-

have no further obligations under this remand.  As to the remainder of father's issues on appeal, we affirm.

[¶30.]        GILBERTSON, Chief Justice, and ZINTER and KERN, Justices, and SEVERSON, Retired Justice, concur.