#30549-a-JMK
**2024 S.D. 63**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

IN THE INTEREST OF
N.K., JR. AND S.K., Minor Children,
and concerning T.M., Mother, and
N.K., Sr., Father, Respondents

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
GREGORY COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE BOBBI J. RANK
Judge

* * * *

MARTY JACKLEY
Attorney General

COURT ROPER
Special Assistant Attorney General
Department of Social Services
Pierre, South Dakota                      Attorneys for petitioner and
                                          appellee, State of South Dakota.


SANDY STEFFEN
Gregory, South Dakota                     Attorney for respondent and
                                          appellant father.

* * * *

CONSIDERED ON BRIEFS
JULY 11, 2024
OPINION FILED **10/23/24**

#30549

KERN, Justice

[¶1.]          The Department of Social Services (DSS) filed an abuse and neglect petition concerning the minor children, N.K., Jr. (age 12) and S.K. (age 6). Over two years after the original petition was filed, the circuit court entered an order terminating Mother's and Father's parental rights. Father now appeals, arguing that the circuit court lacked jurisdiction over this case because a summons was never filed and served; termination of Father's parental rights was not the least restrictive alternative; and the State failed to provide active efforts to prevent the breakup of the Indian family. We affirm.

### Factual and Procedural History

[¶2.]          The children are Indian children as defined under the Indian Child Welfare Act (ICWA) through Mother's enrollment in the Rosebud Sioux Tribe and the Rosebud Sioux Tribe's confirmation that the children are eligible to become members. *See* 25 U.S.C. § 1903(4).[1] Thus, ICWA applies to these proceedings. The Tribes were notified of this action and the Rosebud Sioux Tribe intervened.

[¶3.]          Prior to the start of these proceedings, DSS received an abuse and neglect referral involving Father. In April 2020, DSS was informed that Father was caring for the children while under the influence of alcohol. Throughout the following months, DSS identified impending dangers and provided services to the family. The case was closed in September once the dangers were eliminated.

---

1.          25 U.S.C. § 1903(4) provides: "'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian Tribe and is the biological child of a member of an Indian tribe[.]"

-1-

[¶4.] On August 6, 2021, Father was arrested for driving under the influence in Gregory County. At the time of his arrest, the children were in the car with Father and were not wearing any restraints. DSS was called to the scene and took emergency temporary custody of the children after attempts to find suitable emergency placement failed.[2] DSS noted that the children did not have shoes and were covered with lice when they were placed in DSS custody. The children also informed DSS that Father and the children were homeless.

[¶5.] The State filed a petition alleging abuse and neglect of the children on August 11 in Gregory County. Father was served with a copy of the petition at an advisory hearing held the same day. Shortly after filing the petition, the State learned that Father resided in Tripp County. The case was transferred to Tripp County and the State filed a notice of dismissal of the petition without prejudice. A few weeks later, Father relocated to Gregory County, and the State filed a motion to re-open the file.[3]

[¶6.] On September 8, Father admitted to the allegations in the petition at the adjudicatory hearing. DSS also completed the initial family assessment in September, in which it noted concerns about Father's substance abuse issues,

---

2. Mother was not actively involved in the children's lives prior to the start of these proceedings, and DSS could not locate Mother at the start of this case. Once DSS finally made contact with Mother, she maintained sporadic communication with DSS and was often unwilling or failed to participate in recommended services.

3. The record is unclear about whether the circuit court dismissed the case and later reopened it after a new case was opened in Tripp County, or whether the case was transferred to Tripp County and then transferred back to Gregory County. Father does not challenge this issue on appeal.

parenting skills, and impulse control. Family Service Specialist (FSS) Suzanne Kahler was assigned to provide ongoing services to the family.

[¶7.]     After the adjudication hearing, DSS scheduled biweekly visits between the children and Father, which Father consistently attended. Father also obtained employment and housing in Gregory. In October 2021, Father was charged with ingestion of a controlled substance after testing positive for methamphetamine. Following his arrest, Father completed a drug and alcohol evaluation and was scheduled to participate in outpatient treatment and individual counseling. Toward the end of 2021, DSS facilitated unsupervised visits between Father and the children. During this time, Father would pick up the children from school and have visits with the children twice a week. These visits ended, however, after Father had to leave his home due to maintenance issues and became homeless.

[¶8.]     At the beginning of 2022, Father tested positive for marijuana and was later arrested for aggravated eluding in Brule County. Father was released from jail and began attending inpatient treatment at Stepping Stones. While Father was in treatment, DSS scheduled regular visits between the children and Father via Zoom. In April 2022, Mother admitted to an amended petition filed in this case. Around that same time, DSS learned that the children needed a higher level of care, and the children were moved to therapeutic foster care.

[¶9.]     In the summer of 2022, Father completed treatment and obtained employment and housing in Mitchell. He was also sentenced on his ingestion charge and placed on probation. Father maintained employment, attended AA, and attended aftercare programs throughout the summer. DSS frequently provided

Father with assistance paying for gas and with transportation for visitation between Father and the children. DSS also began working with Father to plan overnight weekend visits with the children.

[¶10.] In the Fall of 2022, DSS began scheduling overnight visitation at Father's home. DSS also referred Father to the Systems of Care program, which would assist Father and the children with transportation, rental assistance, and financial assistance. In November, DSS started planning for reunification of the children with Father. DSS scheduled a trial reunification during Thanksgiving and Christmas. If the trial reunification was successful, DSS planned to assist the children in transferring to a school in Mitchell so that they could live with Father after the start of the new year. Prior to the first trial reunification, FSS Kahler discussed potential safety concerns with Father. Specifically, FSS Kahler informed Father that he could not have anyone living in the home with the children who was not first assessed and approved by DSS. Father informed FSS Kahler that he was not in a relationship and lived by himself.

[¶11.] A few weeks later, DSS implemented a trial reunification starting the day before Thanksgiving. DSS did a home walk-through prior to the visitation and did not note any safety concerns. FSS Kahler also conducted in-home visits over the weekend and did not note any concerns. Unfortunately, Father tested positive for methamphetamine and was arrested the Monday after Thanksgiving. FSS Kahler was informed by Father's parole officer that the children had been left with his live-in girlfriend. This concerned DSS, as Father had denied being in a relationship and the girlfriend was not approved to care for the children.

[¶12.]        FSS Kahler spoke with Father's girlfriend, who indicated that she had recently met Father and moved in with him at the beginning of November.  The girlfriend admitted that Father intentionally hid the fact that she lived with him from DSS because she was not preapproved to stay with the children.  FSS Kahler learned that Father's girlfriend had recently lost custody of her own children and was on probation due to methamphetamine use.  FSS Kahler then spoke with Father, who initially denied using any substances.  He later admitted that he used methamphetamine because he was stressed and overwhelmed with the children being returned to his care.  Father also told FSS Kahler that he intended to remain in a relationship with his girlfriend even if it would negatively affect his chances of reunification.

[¶13.]        At some point after the failed trial reunification, the pipes in Father's trailer home froze, and Father ended up drinking melted snow water.  This caused a liver infection along with other health problems, including cognitive decline.  At the beginning of 2023, Father was readmitted into Stepping Stones for drug treatment due to his ongoing methamphetamine usage.  He later absconded from treatment and was arrested on March 3, 2023.  Father remained in State custody throughout the remainder of these proceedings, because his probation was revoked, and he was sent to prison.  Father's initial parole date was March 30, 2024, with a calculated release date of January 16, 2026.

[¶14.]        On May 31, 2023, the State filed a petition for termination of parental rights, and the court held a final dispositional hearing on August 29, 2023.  At the start of the hearing, Father orally moved for the case to be dismissed, claiming for

the first time that the circuit court did not have jurisdiction over these proceedings because no summons was ever filed or served upon him. Father conceded that he was personally served with the petition alleging abuse and neglect of the children at the advisory hearing on August 11, and the State conceded that no summons was ever issued or served in this case. Thus, the circuit court was left to determine whether it lacked jurisdiction because no summons was issued or served in this case despite Father having actual notice of the proceedings. The circuit court denied the motion to dismiss. The court reasoned that dismissing the case on the day of the final dispositional hearing would not "produce any rational possibility of a different result." The court also determined that, in abuse and neglect proceedings, the failure to file, issue, or serve a summons "is a personal jurisdiction issue [that] can be waived." The court found Father waived his right to object to defects in regard to the summons when he failed to timely object.

[¶15.] After the court denied Father's motion to dismiss, the State presented expert testimony from Luke Yellow Robe. He testified that in his opinion DSS had provided active efforts to reunite the Indian family. Yellow Robe related that, despite DSS's efforts, "we didn't see the behavioral change [needed] from all of the treatment that was offered to dad." Yellow Robe noted that Father had multiple "hot" UAs prior to the failed trial reunification, indicating that Father likely would be unable to obtain sobriety in the near future. As it relates to Mother, Yellow Robe related that DSS's efforts were unsuccessful because Mother was not cooperative with DSS, and DSS could not force Mother to receive treatment.

[¶16.] Yellow Robe also opined that returning the children to Mother or Father would likely result in serious emotional or physical damage to the children, stating that "it would be beyond injurious; it would be dangerous." Yellow Robe further opined that termination of parental rights would be in the children's best interest and was the least restrictive alternative. Yellow Robe noted that this case had been pending for over two years and there were still concerns regarding the parents' substance abuse issues.

[¶17.] The State next presented testimony from FSS Kahler, who discussed the various efforts taken by DSS to reunify the family. These efforts included providing Father with funding for gas and groceries, working with Father on the safety plan, and providing assistance before and during the trial reunification. She further explained that DSS provided frequent visitation between Father and the children when possible. However, due to Father's multiple incarcerations and attending in-patient treatment, DSS was not always able to provide consistent visitation.

[¶18.] FSS Kahler testified that DSS was requesting the termination of parental rights because the children needed stability and permanency and, after two years of providing ongoing services to the parents, DSS did not believe either parent could safely care for the children. She further explained that Father's relapse in November was not the sole factor in making the determination to recommend termination of parental rights. She related that DSS still had major concerns regarding Father's substance abuse issues, parenting skills, and impulse control. DSS was also concerned by the fact that Father intentionally hid the

presence of his live-in girlfriend from DSS and lied to FSS Kahler, indicating that Father did not have the children's best interests in mind.

[¶19.] The State also called FSS Makenzie Anthony to offer testimony related to the children. FSS Anthony testified that the children were originally placed in foster care but were later moved to a therapeutic foster home because the children were struggling with past trauma and had limited coping skills. She related that S.K. struggled with speech while N.K., Jr. was unable to vocalize his needs and often talked back. She testified that the children made significant improvements after being transferred to a therapeutic foster home. FSS Anthony also discussed the various efforts taken by DSS to find relative placements for the children, all of which were unsuccessful.

[¶20.] The circuit court ultimately entered findings of fact, conclusions of law, and an order terminating Mother's and Father's parental rights over the children. The circuit court found beyond a reasonable doubt that continued custody of the children by Father is likely to result in serious emotional or physical damage to the children and that DSS made active efforts to prevent the breakup of the Indian family and those efforts were unsuccessful. *See* 25 U.S.C. 1912(d), (f). The court further found by clear and convincing evidence that termination of parental rights was the least restrictive alternative commensurate with the best interests of the children.

[¶21.] Father now appeals, raising three issues:

> 1. Whether the court erred in denying Father's motion to dismiss.

2. Whether the court clearly erred in finding that the termination of Father's parental rights was the least restrictive alternative.

3. Whether the court erred in finding that DSS provided active efforts and that those efforts were unsuccessful.

## Analysis

### *Motion to Dismiss*

[¶22.] Father contends that the circuit court erred in denying his motion to dismiss, arguing the court lacked jurisdiction over the proceedings because no summons was issued, served, or filed. Father further contends the failure to issue, serve, or file a summons violated his constitutional right to due process. This Court has not previously determined whether a circuit court lacks jurisdiction over an abuse and neglect proceeding where no summons was ever issued, served, or filed.

[¶23.] "Generally, the principal purpose of original process is to give to the party to whom it is addressed notice of a proceeding so that such party may respond, be heard, or defend and thereby safeguard his or her person, property, and rights." 62B Am. Jur. 2d Process § 2 (2024). To that end, "[t]he purpose of a summons is to give notice to a person to appear at a certain place and time to answer a complaint against him or her[.]" 62B Am. Jur. 2d Process § 73 (2024).

[¶24.] In South Dakota, after a petition alleging abuse and neglect has been filed in the circuit court, "the court, the clerk of the court, or the prosecuting attorney shall issue a summons stating the time, date, and place for the hearing on the petition that is directed to the child's parents, guardian, or custodian[.]" SDCL 26-7A-44. "The summons shall be served in the same manner as personal service of summons according to the rules of civil procedure or by publication as provided in

this chapter not less than five days before the date of the hearing on the petition and shall be served . . . [o]n the other persons or parties named in the summons." SDCL 26-7A-47. Here, it is undisputed that neither the court, the clerk of the court, nor the prosecuting attorney issued or served a summons on Father as required under SDCL 26-7A-44 and 26-7A-47.

[¶25.] In support of his argument that the court erred in denying his motion to dismiss, Father relies on *Deno v. Oveson*, 307 N.W.2d 862 (S.D. 1981). In that case, Deno filed a libel action in small claims court against Oveson, the Department of Public Works superintendent for the City of Sioux Falls. *Id.* at 862. Oveson moved the action to circuit court, where Deno then filed an amended complaint. *Id.* at 863. The circuit court ultimately granted summary judgment for Oveson, dismissing the action on the merits, and Deno appealed. *Id.* This Court proceeded to dismiss the appeal after determining that the circuit court lacked jurisdiction over the case. In doing so, the Court noted that small claims courts do not have jurisdiction over libel actions and, in turn, the action never commenced in small claims court. *Id.* Further, the Court held that, because Deno never issued, filed, and served a summons regarding his amended complaint in circuit court, the action was never commenced. *Id.* This Court reasoned that "[w]hile the service can be waived by appearance where a summons has been actually issued and later filed, the failure to issue, file, or serve a summons . . . deprives the court of jurisdiction." *Id.* (citing SDCL 15-2-30, 15-2-31, 15-6-3, and 15-6-5(d)).

[¶26.] Despite Father's claim to the contrary, *Deno* is not instructive here. In holding that a court lacks jurisdiction over a civil action where no summons had

been issued, filed, or served, this Court relied on SDCL 15-2-30 and 15-2-31. *See Deno*, 307 N.W.2d at 863. SDCL 15-2-30 provides that a civil action "*is commenced as to each defendant when the summons is served on him, or on a codefendant who is a joint contractor or otherwise united in interest with him.*" (emphasis added).

[¶27.] While juvenile proceedings are civil in nature, *see In re S.A.*, 2005 S.D. 120, ¶ 17, 708 N.W.2d 673, 679, they are distinct from civil actions generally brought under SDCL Title 15. Juvenile proceedings are brought under SDCL Title 26 and "shall be in the best interests of the child." SDCL 26-7A-5. Contrary to Title 15, there is no language in Title 26 which provides that a juvenile proceeding is commenced upon issuance and service of the summons. Rather, such proceedings are commenced when the State's Attorney files a petition in accordance with SDCL 26-7A-43. While issuance and service of a summons are procedural requirements under SDCL 26-7A-44 and 26-7A-47, unlike the reference in SDCL 15-2-30 to a civil *action* being commenced upon the service of a summons, SDCL 26-7A-47 refers only to the commencement of a *hearing* on the previously filed petition.

[¶28.] It is apparent that the purpose of the summons as outlined in SDCL 26-7A-44 is to notify the other interested persons, namely the child's parents, guardians, or custodians, of the time, date, and place of any hearing on the petition, to require such persons to appear and respond at such hearing, and to inform them of their right to an attorney and that termination of parental rights is a possible consequence if the petition is sustained. Therefore, the failure to serve a summons in accord with SDCL 26-7A-47 does not deprive the circuit court of jurisdiction over

the proceedings. Instead, circuit courts obtain jurisdiction over juvenile proceedings once the petition is filed.

[¶29.] As to Father's further contention that his due process rights were violated when he was not served with a summons, we have noted that "[d]ue process requires a party be informed of the pendency of an action against him." *Matter of R.P.*, 498 N.W.2d 364, 366 (S.D. 1993) (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 657, 94 L. Ed. 865, 873 (1950)). We have further noted that "[d]ue process of law . . . does not require the state to adopt any particular form of procedure, so long as it appears that the accused has had sufficient notice of the [proceedings] and an adequate opportunity to [be heard]." *Id.* (quoting *State v. Winters*, 414 N.W.2d 1, 2 (S.D. 1987)) (second and third alterations in original). Thus, actual notice of the proceedings "is sufficient notice to comply with procedural due process." *Id.* at 367.

[¶30.] Here, the record shows that Father had actual notice of the proceedings. It is undisputed that Father was personally served at the advisory hearing with the petition alleging the children to be abused and neglected and was advised by the circuit court of his right to an attorney and that termination of parental rights was a potential consequence of the proceeding. Father then continued to appear with counsel throughout the adjudicatory and dispositional portion of the proceedings. Because actual notice is sufficient to comply with due process, Father's constitutional due process rights were not violated. *See R.P.*, 498 N.W.2d at 367; *see also Matter of J.W.W.*, 334 N.W.2d 513, 516 n.4 (S.D. 1983) (explaining that even if a parent is not properly served with notice of an abuse and

neglect proceeding, the circuit court obtains jurisdiction over the parent when the parent submits to the jurisdiction of the court). Additionally, any argument by Father that the circuit court lacked personal jurisdiction over him due to insufficient process was waived when he failed to timely object. *See R.P.*, 498 N.W.2d at 367 (holding that objections to personal jurisdiction and sufficiency of process are waived in abuse and neglect proceedings "if the party fails to object at the appropriate time.").

[¶31.] Based on the foregoing, the circuit court did not err in denying Father's motion to dismiss. The circuit court obtained jurisdiction over these proceedings once the petition was filed. Further, Father's due process rights were not violated because he had actual notice of these proceedings from the day the original petition was filed.

### *Least restrictive alternative*

[¶32.] Parental rights may be terminated if termination is "the least restrictive alternative available commensurate with the best interests of the child[ren] with due regard for the rights of the parents, the public and the state . . . ." SDCL 26-8A-27. Whether termination is the least restrictive alternative available commensurate with the children's best interest is a question of fact reviewed for clear error. *In re L.S.*, 2012 S.D. 22, ¶ 12, 812 N.W.2d 505, 508 (citation omitted). Under this standard, findings of fact "will not be set aside unless we are left with a definite and firm conviction that a mistake has been made." *In re L.N.*, 2022 S.D. 8, ¶ 34, 970 N.W.2d 531, 542 (citation omitted) (internal quotation marks omitted).

[¶33.]     Father emphasizes the bond between himself and the children in arguing that a guardianship would have been a lesser restrictive alternative to termination because "Father would be paroled, at the latest, 7 months from the date of the termination trial." "While termination of parental rights must be exercised cautiously, the best interest of the [child] must always prevail. A child's best interests are viewed from the child's perspective." *L.S.*, 2012 S.D. 22, ¶ 21, 812 N.W.2d at 509 (alteration in the original) (citations omitted) (internal quotation marks omitted). The circuit court found that "[t]he children are bonded with [Father], and he cares for them. However, he has been unable or unwilling to provide them a stable and safe residence because of his ongoing substance abuse issues."

[¶34.]     The record shows that Father had a long history of substance abuse issues, and these issues were not resolved at the time of the final dispositional hearing. Father was arrested multiple times during the pendency of this case due to his substance abuse. As the circuit court found, even after completing inpatient treatment "[Father] almost immediately turned to methamphetamine when faced with the stress of parenting the children during the trial reunification . . . ." Father showed during the trial reunification that he had not only failed to resolve his substance abuse issues, but also lacked proper parenting skills to care for the children. At the time of termination, Father had been endeavoring for more than two years to resolve these issues, and the children "should not be required to wait for [Father] to acquire parenting skills that may never develop." *L.S.*, 2012 S.D. 22, ¶ 22, 812 N.W.2d at 510.

[¶35.]    Although Father believes that a guardianship is the least restrictive alternative, "guardianships, by their very nature, are temporary." *In re P.K.*, 2006 S.D. 17, ¶ 26, 711 N.W.2d 248, 256 (citation omitted). The circuit court properly found that, "[t]he minor children need and deserve permanency and a home that can meet their needs. . . . The [ ] parents are not able to provide proper and necessary care for the minor children . . . ." At the time of the final dispositional hearing, Father was in prison with his initial parole date approximately seven months away. A guardianship would only subject the children to more instability and insecurity while waiting for Father to serve his prison sentence, resolve his substance abuse issues, and learn to properly provide and care for the children, with the latter two being no guarantee.

[¶36.]    Father has shown throughout the course of these proceedings that he cannot control his addictions and provide the children with the care and stability they desperately need. "[W]hen it comes to something as important as the welfare of young children, promises of the parents to conform to the standard of care for their children which is expected in our society do not carry as much weight as their past actions of not properly caring for the children." *P.K.*, 2006 S.D. 17, ¶ 21, 711 N.W.2d at 255 (citation omitted). Therefore, the circuit court did not clearly err in finding that termination of Father's parental rights was the least restrictive alternative available commensurate with the children's best interests.

***Active Efforts***

[¶37.]    Under ICWA:

> Any party seeking . . . termination of parental rights, to an
> Indian child under State law shall satisfy the court that active

efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

25 U.S.C. § 1912(d). "Whether active efforts were provided under ICWA is a mixed question of law and fact subject to de novo review." *In re P.S.E.*, 2012 S.D. 49, ¶ 15, 816 N.W.2d 110, 115 (citation omitted).

[¶38.]    Active efforts are "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite" the Indian family. 25 C.F.R. § 23.2. "Active efforts are to be tailored to the facts and circumstances of the case[.]" *Id.* Further, active efforts from DSS "must involve assisting the parent . . . through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan." *Id.* "DSS cannot simply give a parent a case plan and wait for the parent to complete the plan" to satisfy the active efforts requirement. *In re C.H.*, 2021 S.D. 41, ¶ 28, 962 N.W.2d 632, 640.

[¶39.]    Based on our review of the record we conclude that the circuit court properly found that DSS provided active efforts to reunite the Indian family throughout the pendency of this case. DSS completed an initial family assessment, child case plan, and protective capacity assessment. It provided transportation and gas payments to Father to ensure he received visitation with the children. Further, DSS conducted an in-home safety plan and paid for psychological testing and individual counseling. DSS also referred Father to Systems of Care services to help Father move toward reunification with the children.

[¶40.]    Indeed, even Father does not contend that DSS did not provide active efforts. Rather, Father argues that the State failed to prove beyond a reasonable

doubt that those efforts were unsuccessful. *See* 25 U.S.C. § 1912(d). Father's argument is not persuasive. While DSS's efforts initially led to Father successfully completing treatment, it is apparent from the record that he could not properly care for the children or maintain his sobriety. Over one year after DSS started providing services, a trial reunification was held between the children and Father. Within one week, Father tested positive for methamphetamine and was arrested for violating the terms and conditions of his probation. As the court noted in its oral ruling, "by [Father's] own admission, the reason that he [used methamphetamine during the trial reunification] was because he could not handle the pressure of caring for the children and this was after he had obtained treatment. And . . . the whole point of treatment is to provide coping mechanisms to address turning to something other than drugs and alcohol to handle pressures."

[¶41.]     Despite DSS's efforts, Father continued to struggle with his addictions and could not properly care for the children. Instead of focusing on his recovery from his substance abuse disorder, Father absconded from treatment and was later sentenced to serve time in prison for violating probation. DSS's concerns with Father at the start of this case were his substance abuse issues, parenting skills, and impulse control. FSS Kahler testified at the final dispositional hearing that these remained ongoing concerns over two years later. Therefore, the circuit court did not err in finding that DSS provided active efforts and that those efforts proved unsuccessful. We affirm.

[¶42.]     JENSEN, Chief Justice, and SALTER, DEVANEY, and MYREN, Justices, concur.